UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIOLET ELIZABETH GRAYSON,<br><br>Plaintiff,<br><br>-against-<br><br>RESSLER & RESSLER, ELLEN WERTHER, BRUCE RESSLER, TRADEWINDS HOLDINGS INC., COREOLIS HOLDINGS INC., RICHARD RESSLER, and ORCHARD CAPITAL CORPORATION,<br><br>Defendants. | Case No. 1:15-cv-08740-ER<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Violet Elizabeth Grayson, for her Complaint, alleges:

## INTRODUCTION

1. Defendants, through their tortious machinations and defamatory statements, deprived Plaintiff attorney of a multi-million dollar fee in a contingency case, and injured Plaintiff's professional reputation. Additionally, Defendants violated federal consumer credit law, and converted Plaintiff's property to their own use. Plaintiff seeks both compensatory and punitive damages.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff Violet Elizabeth Grayson ("Grayson") is a licensed attorney, and a citizen of the State of California.

3. Defendant Ressler & Ressler (the "Ressler Firm") is a small law firm with its principal place of business in New York County, New York.

4. Defendant Ellen Werther ("Werther") is a licensed attorney and a partner in the Ressler Firm. She is a citizen of the State of New York.

5. Defendant Bruce Ressler is a licensed Attorney and a partner in the Ressler Firm. He is also the husband of defendant Werther. He is a citizen of the State of New York.

6. Defendant Richard Ressler is the brother of Bruce Ressler, and the brother-in-law of Werther. He controls Orchard Capital Corporation. He is a citizen of the State of California.

7. Defendant Orchard Capital Corporation ("Orchard Capital") is a California Corporation controlled by Richard Ressler.

8. Defendant Coreolis Holdings, Inc. ("Coreolis") is a Delaware Corporation controlled by defendants Richard Ressler and Orchard Capital. Coreolis is a shell corporation that places a corporate layer between Richard Ressler and Orchard Capital on the one hand, and TradeWinds Holdings, Inc. on the other.

9. Defendant TradeWinds Holdings, Inc. ("Holdings") is a Delaware Corporation controlled by defendants Richard Ressler and Orchard Capital. TradeWinds Holdings is wholly owned by Coreolis.

10. As to all of the acts alleged herein, Defendants Werther, Bruce Ressler, and the Ressler Firm acted in concert, and at the direction of and as agents for Defendants Richard Ressler, Orchard Capital, Coreolis, and Holdings.

11. This Court has federal question jurisdiction over the instant action per 28 U.S.C. section 1331, as one cause of action arises under 15 U.S.C. section 1681 et seq.

12. Venue is proper in the Southern District of New York, as Defendant Ressler Firm has its principal place of business in Manhattan, and as most of the events giving rise to this action occurred in Manhattan.

**FACTS COMMON TO ALL CAUSES OF ACTION**

13. In 2005, Attorney Grayson was seeking to collect a multi-million dollar judgment that she had obtained for her client, Jet Star Airlines, against C-S Aviation Corporation, in the United States District Court for the Southern District of New York. C-S Aviation defaulted in Southern District litigation pending before Judge Deborah Batts, and closed its doors on the day when the resulting default judgment would have become collectible. The telephone number for C-S Aviation was answered with a recording stating: "You have reached a non-working number at Soros Fund Management."

14. Grayson's subsequent investigation supported several alternative theories of recovery, including: (a) piercing the corporate veil of C-S Aviation to reach its principals, George Soros and Purnendu Chatterjee, or (b) recovering from a consortium of banks to whom C-S Aviation's assets appeared to have been fraudulently transferred. Grayson filed suit in the Southern District of New York, and the case was assigned to Judge Harold Baer.

15. The alternative theories of recovery -- fraudulent transfer or veil-piercing -- placed defendants in a conundrum, insofar as the fraudulent transfer cause of action

was best defended by urging that C-S Aviation had no assets, whereas such an admission tended to strengthen the veil piercing claim. The defendants prioritized defending the fraudulent transfer cause of action, and submitted in support of their motion for summary judgment, the declaration of C-S Aviation's last president, James Walsh, stating that C-S Aviation was designed as a management company, which had no assets of its own, but instead managed assets held by offshore special purpose companies. Thus, summary judgment was granted as to the fraudulent transfer claim and denied as to the veil piercing claim. Shortly thereafter, the case settled.

16. In the spring of 2008, Grayson was contacted by the Tuggle, Duggins law firm of Greensboro, North Carolina. Tuggle, Duggins represented TradeWinds Airlines ("Airlines") in North Carolina state court litigation where C-S Aviation had defaulted. Grayson and Tuggle, Duggins agreed that Tuggle, Duggins would obtain a default judgment on the strength of the default already entered, and that Grayson would then file suit against George Soros and Purnendu Chatterjee in the Southern District of New York to pierce the corporate veil of C-S Aviation, and recover the North Carolina judgment from Soros and Chatterjee. Grayson and Tuggle, Duggins agreed to split the 50% contingency fee from any ultimate recovery.

17. On June 27, 2008, Tuggle, Duggins secured a $54,867,872.49 judgment against C-S Aviation in North Carolina state court. On June 30, 2008, Grayson filed a veil piercing suit against Soros and Chatterjee in the Southern District of New York. This case was assigned to Judge John Keenan.

18. On July 25, 2008, Airlines filed a petition for Chapter 11 bankruptcy protection in the Southern District of Florida. A motion to employ Grayson and Tuggle, Duggins as Special Litigation Counsel, to continue their efforts to collect the default judgment, was filed in the bankruptcy court on August 20, 2008. On September 9, 2008, the motion was granted *nunc pro tunc* to the date of the Chapter 11 petition. The terms of retention were modified, with Special Litigation Counsel Grayson and Tuggle, Duggins to split a contingency fee equal to 50% of the first $15 million recovered, and $33% of any recovery in excess of $15 million.

19. On or about September 25, 2008, Grayson received a letter from the Ressler Firm asserting that some or all of the North Carolina default judgment belonged to the Firm's client, Holdings, which was the former corporate parent of Airlines. The letter was followed by a telephone call to Grayson from Werther, Bruce Ressler, and Richard Ressler, to the same effect. The position taken by Werther and the Ressler brothers was without merit, Holdings having relinquished its interest in Airlines years earlier.

20. Also in late September of 2008, counsel for George Soros contacted Grayson, and asserted that Grayson had violated the terms of the confidentiality agreement and/or the settlement agreement in the earlier *Jet Star*, by representing TradeWinds Airlines in the newly filed piercing action. The assertion made no sense as Soros had retained for the *TradeWinds Airlines* case, the same counsel who represented him in the *Jet Star* case.

21. On October 30, 2008, the *TradeWinds Airlines* Chapter 11 bankruptcy case was converted to a Chapter 7 case. The following day, Barry E. Mukamal was appointed as Chapter 7 Trustee.

22. Late in the day on November 11, 2008, Werther telephoned Grayson. Werther bad-mouthed the Tuggle Duggins firm, and urged Grayson to effectively switch sides and support Holdings' claims. She stated that she had retained North Carolina counsel to "blow up" Airlines' judgment, and that Grayson would be sorry if she did not cooperate. The following morning, Grayson contacted Tuggle, Duggins, the newly appointed Chapter 7 Trustee, and the Trustee's counsel, and recounted her conversation with Werther.

23. Werther made good on her threats. Coreolis filed a motion in North Carolina state court seeking revision of the default judgment. As a consequence of this motion, the default judgment (but not the underlying default) was vacated, and the matter set for discovery and trial, to determine what was owing to whom.

24. Werther also contacted the Chapter 7 Trustee, and attempted to persuade him to retain herself and the Ressler Firm in Grayson's place. When Werther failed to persuade the Trustee, her client, Coreolis, filed opposition to the Trustee's motion to retain Grayson and Tuggle, Duggins as Special Litigation Counsel. Said opposition urged that Grayson should not be retained because Soros was attempting to disqualify her, and that Tuggle, Duggins should not be retained because that firm had obtained a default judgment for Airlines without informing counsel for Coreolis. The bankruptcy court was not persuaded by these arguments, and granted the Trustee's motion to retain Grayson and Tuggle, Duggins as Special Litigation counsel.

25. Although Werther and her clients could not dissuade the bankruptcy court from approving retention of Grayson and Tuggle, Duggins as Special Litigation Counsel, the Trustee *did* use Coreolis's Opposition as leverage for persuading Special Litigation Counsel to reduce their fees. As a consequence of interference from Werther and her clients, the contingency fee of Special Litigation Counsel was reduced, in the Chapter 7 case, to 40% of the first $14 million recovered, and 33% of any recovery in excess of $14 million.

26. Meanwhile, George Soros filed a motion to disqualify Grayson as counsel for Airlines in the Southern District veil piercing litigation. Soros's co-defendant, Chatterjee, did not join in this motion. The motion was briefed and orally argued. On May 12, 2009, Judge Keenan denied the motion to disqualify.

27. In North Carolina, the parties proceeded with discovery, preparatory to a damages trial. During the discovery period, an agreement was reached between Airlines on the one hand, and Coreolis and Holdings on the other, that Coreolis and Holdings would seek their own, separate judgment against C-S Aviation, rather than attempting to obtain part of Airlines' judgment.

28. The damages case was tried in North Carolina state court in May of 2010. During the damages trial, Coreolis and Holdings introduced expensive expert testimony concerning what their interest in Airlines would have been worth under hypothetical circumstances. The trial judge rejected this testimony in his remarks at the close of the damages trial. Nonetheless, other evidence supported a judgment in favor of Coreolis and Holdings, for approximately $38 million inclusive of trebling

and interest. Airlines received a judgment of $56,134,104, also inclusive of trebling and interest. Both judgments were against defunct shell corporation C-S Aviation.

29. After receiving their own judgment from the North Carolina court, Coreolis and Holdings, through their counsel, the Ressler Firm, filed an action in the Southern District of New York seeking to pierce the corporate veil of C-S Aviation and recover their judgment from Soros and Chatterjee. The new veil piercing case filed by Coreolis and Holdings was consolidated with the extant veil piercing case filed by Airlines. In this way, Grayson and the Ressler Firm became, effectively, co-counsel. Werther, who is a commercial litigator and bankruptcy lawyer, played a more prominent role than her husband, who is primarily a personal injury and medical malpractice lawyer. Grayson and the Ressler Firm signed a Joint Prosecution Agreement.

30. Soros and Chatterjee, acting on behalf of their shell corporation, C-S Aviation, pursued an appeal from the default judgment, and then a request for North Carolina Supreme Court review. These played out over the course of three years. During this period, the federal district court largely stayed discovery, but Judge Keenan permitted depositions of certain witnesses who were elderly or ill. The district court did not authorize full document discovery in support of these depositions, but only production of documents authored by or sent to the deponents. This placed Werther at a disadvantage insofar as the other lawyers appearing in the case had participated in the earlier *Jet Star* piercing case, and so understood the broader factual context, whereas Werther did not.

31. Disconnected from the broader factual context of the case, Werther became obsessed with proving that C-S Aviation had no assets and was insolvent to the extent of being unable to pay a judgment. Werther's pet issue was not actually an issue at all, because, in the *Jet Star* case, the last president of C-S Aviation, James Walsh, filed a declaration stating that C-S Aviation never had any assets. Although the Walsh declaration was a matter of public record, Werther continued to obsess over the moot point. At the deposition of C-S Aviation's first President, Bharat Bhise, Werther demanded that inordinate time, in a time-limited deposition, be devoted to C-S Aviation's balance sheet, as opposed to gathering fresh testimony from percipient witness Bhise.

32. Werther was also determined to hire her long-time friend, attorney Martin Bienenstock, to render an expert opinion regarding C-S Aviation's financial condition. Werther wished to hire her long-time friend and pay him a great deal for an analysis of C-S Aviation's finances, even though Bienenstock was not an accountant, and even though C-S Aviation's lack of assets was already an established fact. Further, Werther demanded that Grayson, as counsel for Airlines, foot half of Bienenstock's bill.

33. On July 10, 2013, the partial stay of discovery in the two consolidated Southern District veil piercing cases was lifted, after the North Carolina Supreme Court denied review. Grayson immediately suggested that Werther subpoena from Grayson all deposition transcripts from the prior *Jet Star* veil piercing case, so that Werther could come up to speed with the other attorneys. Werther served the subpoenas, and Grayson ably assisted Werther through the hearing at which counsel

for Defendant Soros sought, unsuccessfully, to squash the subpoena. Grayson delivered the original transcripts to Werther with the express understanding that they would be copied and returned. Werther instead stole the transcripts and commenced a campaign to oust Grayson as counsel for Airlines.

34. Werther wished to replace Grayson with an attorney who would allow Werther to function as lead counsel, and also provide a deep pocket to fund Werther's lavish expert witness hiring plan. Werther was indifferent to the fact that an attorney brought into the case only a few months before the close of discovery could not come up to speed on the facts of the case (long known to defendants' counsel), and could not effectively represent Airlines in the veil piercing case.

35. In order to replace Grayson with a malleable, deep-pocket law firm of her own choosing, Werther first needed to persuade the Chapter 7 Trustee to fire Grayson. To this end, Werther deliberately fomented discord with Grayson, and sent e-mails to document this discord. Upon information and belief, Werther, directly or indirectly, contacted counsel for the bankruptcy estate's primary creditor, and disparaged Grayson to this attorney. As a consequence of Werther's machinations, the attorney for the bankruptcy estate's primary creditor questioned the Trustee's employment of Grayson, and made telephone calls to the Trustee and/or his counsel threatening to sue the Trustee.

36. Finally, Werther arranged to meet with the bankruptcy Trustee's counsel in Grayson's absence. The meeting was scheduled for August 15, 2013. In anticipation of the meeting, the Ressler Firm pulled Grayson's credit information in violation of the federal Fair Credit Reporting Act, 15 U.S.C. section 1681 et seq.

37. Defendants Werther and Bruce Ressler met with the bankruptcy trustee's counsel, Robert M. Mayer, at the law offices of the Ressler Firm, located at 48 Wall Street, New York, N.Y., on August 15, 2013. At this meeting, Werther and Bruce Ressler systematically defamed Grayson. They falsely stated that Grayson had left them to do the lion's share of the work in both piercing cases. Precisely the opposite was true. Grayson drafted every significant document in the cases. The only area where the Ressler Firm took a leading role was electronic discovery, with particular attention to metadata. Werther and Bruce Ressler also claimed that they had to take a leading roll in depositions because of some type of conflict of interest arising from Grayson's participation in the *Jet Star* case. This was nonsense. Grayson took the lead at the Bhise deposition, and was prepared to take the lead at all depositions going forward. Werther and Bruce Ressler further asserted that it was necessary to hire a very expensive expert witness to analyze C-S Aviation's financial status. Werther and Bruce Ressler presented to Mayer, the credit information that they had illegally gathered, as proof that Grayson could not pay such an expert witness. Werther and Bruce Ressler generally characterized Grayson as professionally unfit to represent Airlines in the veil piercing case. Precisely the opposite was true. Grayson had represented Jet Star Airlines very ably in the original veil piercing case against Soros and Chatterjee, and was representing TradeWinds Airlines and its Chapter 7 Trustee very ably in the second veil piercing case.

38. When Werther and Bruce Ressler made the foregoing false and defamatory statements to the Chapter 7 Trustee's counsel, Robert M. Mayer, they knew the statements to be false. The statements were made with malice, and with intent to

injure Grayson in her profession. The false statements were also made with the intention of financially benefitting potential expert witness Bienenstock, and financially benefitting Richard Ressler and Orchard Capital, who would bear the full cost of Werther's lavish spending plan alone if Werther was not able to bring in deep-pocketed co-counsel.

39. Trustee's counsel Mayer took the defamatory statements and illegally gathered information presented to him by Werther and Bruce Ressler at the August 15, 2013 meeting, and conveyed them to his client, Chapter 7 Trustee Barry Mukamal. On August 19, 2013, Mukamal sent a letter to Grayson dismissing her as Airlines' counsel in the veil piercing case. Grayson's dismissal was the consequence of Defendants' machinations, unlawful conduct, and defamatory statements as set forth above.

40. At a hearing held in the Southern District veil piercing case on September 4, 2013, Grayson requested leave to withdraw as counsel for Airlines because her client had dismissed her. Counsel for Defendant Soros remarked on the record that Grayson had rendered "superb" representation to her client. This was true. At the time of her dismissal, Grayson had worked on the piercing case for more than five years, and expended nearly 1,800 hours on the case. She found her dismissal acutely emotionally distressing.

41. After Grayson was dismissed, it was, of course, necessary for Airlines to locate replacement counsel. Indeed, the need was pressing, as only four months remained in the discovery period, and the litigation was moving forward rapidly. Werther took the initiative in locating counsel to represent her clients' co-plaintiff.

She located and championed the Sussman, Godfrey firm, which she favored for their deep pockets. Werther knew, or should have known, that Bill Carmody, the Susman partner whom she had selected to replace Grayson, would not devote the time necessary to rapidly master the facts of the case. Nonetheless, Werther urged the Chapter 7 Trustee to retain Susman, Godfrey because the Susman firm was prepared to pay approximately $200,000 in expert witness fees. Werther succeeded in persuading the Chapter 7 trustee to retain Bill Carmody and his law firm, Susman Godfrey.

42. As was foreseeable, neither Bill Carmody nor any other lawyer at Sussman Godfrey mastered the facts of the veil piercing case. Indeed, a revolving cast of lawyers appeared for Airlines. Werther never mastered the pertinent facts either. Orchard Capital and the Susman firm *did* spend lavishly on expert witnesses, notably Bienenstock, whose report was entirely unnecessary.

43. When Soros and Chatterjee filed a motion for summary judgment in the veil piercing cases, Werther and Sussman Godfrey responded with a combination of: (a) quotations from Judge Baer's opinion in the *Jet Star* case denying summary judgment on that veil piercing claim; and (b) expert opinion, primarily that of Bienenstock. It does not appear from the papers submitted in opposition to summary judgment that plaintiffs' counsel either gathered substantial new evidence, or fully familiarized themselves with the evidence gathered prior to Grayson's dismissal. Highly probative evidence was missing from plaintiffs' submission in opposition to summary judgment.

44. Defendants objected to the purported expert opinion of Bienenstock on the ground that he was an attorney rather than an accountant, and was not qualified to render an opinion regarding the finances of C-S Aviation. Judge Keenan never reached the issue of Bienenstock's qualifications, because he granted summary judgment for Soros and Chatterjee on an issue the Ressler Firm and Susman Godfrey neglected to brief.

45. Soros and Chatterjee had urged that the case required "double piercing" insofar as George Soros had controlled C-S Aviation not directly, but rather through his corporation Soros Fund Management. Plaintiffs should have responded to this assertion by arguing, in the alternative, that: (a) George Soros controlled C-S Aviation directly, and (b) double piercing was warranted because Soros Fund Management, like C-S Aviation, was organized as a shell management corporation without assets, and Soros had ignored and abused the corporate form in conducting the affairs of Soros Fund Management. Instead, the Ressler Firm and Susman Godfrey cavalierly asserted that this was "not a double piercing case." They failed to muster the best evidence for the proposition that George Soros controlled C-S Aviation directly. They failed to present evidence that Soros had ignored and abused the corporate form in conducting the affairs of Soros Fund Management, although strong evidence was already available at the time of Grayson's dismissal, and was a matter of public record. What is more, the Ressler Firm and Susman, Godfrey evidently failed to use discovery to gather additional evidence that Soros had ignored and abused the corporate form in conducting the affairs of Soros Fund Management.

46. The Ressler Firm and Susman Godfrey were also grossly ineffective in failing to include in their opposition to summary judgment any argument that Defendant Purnendu Chatterjee was responsible for C-S Aviation's abuse of the corporate form, and that the corporate veil of C-S Aviation should be pierced to reach him. The evidence against Chatterjee was very strong, because he was always the sole shareholder of C-S Aviation, and, at pertinent times, C-S Aviation's sole director. Chatterjee's abuse of the corporate form was sufficient to overcome a summary judgment motion in 2006, and in the period intervening between 2006 and the summary judgment motion in the subsequent piercing cases, Chatterjee engaged in further abuse of the corporate form. He allowed C-S Aviation's corporate status to lapse, then revived C-S Aviation solely for the purpose of defending the North Carolina action, filed false addresses for C-S Aviation with the state of Delaware, and sent a *faux* corporate officer to appear as a warm body at the North Carolina damages trial.

47. The Ressler Firm and Sussman Godfrey were ineffective, not only in failing to present evidence in opposition to summary judgment, but also in failing to cite pertinent legal authority, including Second Circuit authority for the proposition that funding and facilitating litigation on behalf of a shell corporation warrants piercing of the corporate veil. As a consequence of the sub-par legal services rendered by the Ressler Firm and Susman Godfrey, summary judgment was granted to Defendants Soros and Chatterjee in the piercing cases on March 31, 2015. The Second Circuit affirmed via summary order on March 11, 2016. If Grayson had not been dismissed,

she would have rendered excellent legal services, and the motion for summary judgment would have been denied.

48. If summary judgment had been denied, Soros and Chatterjee would, in all probability, have settled the veil piercing cases. It seems highly unlikely that Soros would have been disposed to sit through a trial. A realistic settlement value for the Airlines case would have been $45 million. If the case had been tried, and tried competently, Airlines would have prevailed, and received a judgment of approximately $70 million inclusive of interest.

49. As a consequence of Defendants' actions as set forth above, Grayson has suffered damages, including loss of her contingency fee from the veil piercing litigation, loss of the value of her time, litigation costs, damage to her professional reputation, loss of the enhancement to her professional reputation which would have followed from successful completion of the case, and severe emotional distress. The value of these damages is not less than $20 million.

**FIRST CAUSE OF ACTION FOR DEFAMATION**

50. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

51. As set forth in detail in paragraph 37 above, on August 15, 2013, at the law office of the Ressler Firm, located at 48 Wall Street in Manhattan, Defendants Werther and Bruce Ressler made false and defamatory statements concerning Grayson. These malicious and deliberately false statements were made at the behest of, and on behalf of, all Defendants herein.

52. The defamatory statements caused injury to Grayson in the manner previously described herein. They also constituted slander and defamation *per se* because they disparaged Grayson in her profession. The defamatory statements constituted morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society.

**SECOND CAUSE OF ACTION FOR INJURIOUS FALSEHOOD**

53. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

54. Defendants circulated injurious falsehoods concerning Grayson to Chapter 7 Trustee Barry Mukamal, to Trustee's counsel, and to counsel for the primary creditor of the Chapter 7 estate, as previously set forth herein. Upon information and belief, Defendants also circulated injurious falsehoods concerning Grayson to other persons involved with the affairs of TradeWinds Airlines and the veil piercing litigation, including attorneys at Tuggle, Duggins. The gist of all of the injurious falsehoods circulated by Defendants was that Grayson was not an attorney fit to represent Airlines in the veil piercing litigation, and was not representing Airlines effectively in the veil piercing litigation. Precisely the opposite was true. Defendants circulated injurious falsehoods concerning Grayson with knowledge of their falsity and with malice. As a consequence of circulation of these injurious falsehoods by defendants, Grayson was injured in the manner previously described.

55. The circulation of injurious falsehoods by Defendants herein constituted morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society.

## THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT

56. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

57. As previously set forth herein, Defendants defamed Grayson, circulated injurious falsehoods concerning Grayson, and fomented discord for the purpose causing bankruptcy Trustee Mukamal to terminate his contingency fee contract with Grayson. Defendants in fact succeeded in inducing Trustee Mukamal to terminate his contract with Grayson. This resulted in injury to Grayson as previously set forth.

58. Defendants' actions designed to induce Bankruptcy Trustee Mukamal to terminate his contract with Grayson were unprivileged and malicious. These actions constituted morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society.

## FOURTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

59. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

60. By defaming Grayson, circulating injurious falsehoods concerning Grayson, and fomenting discord, as previously set forth herein, Defendants interfered with the prospective business advantage that Grayson would have enjoyed had she been allowed to successfully complete her representation of Airlines in the veil piercing case. As previously set forth herein, Grayson was injured by this loss of prospective business advantage.

61. Defendants' actions interfering with Grayson's prospective business advantage were malicious and unprivileged. Their actions constituted morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society.

**FIFTH CAUSE OF ACTION FOR VIOLATION OF FEDERAL FAIR CREDIT REPORTING ACT, 15 U.S.C. SECTION 1681 ET SEQ.**

62. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

63. Defendants violated the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. section 1681 et seq., by pulling Plaintiff's consumer credit records for a purpose not authorized or permissible under the FCRA, by disseminating said credit information in a fashion violative of the FCRA, and by failing to comply with consumer disclosure requirements of the FCRA. Defendants' actions in violation of the FCRA were probably willful, and at the very least negligent. Indeed, it is highly probable that Defendants acted with malice.

64. Defendants actions set forth in the foregoing paragraph may have caused actual injury to Grayson insofar as they contributed to Defendants' presentation to Robert Mayer on August 15, 2013. Regardless of whether Defendants' actions in violation of the FCRA caused Grayson actual damage, Defendants are liable for statutory fines and punitive damages as set forth in the FCRA.

**SIXTH CAUSE OF ACTION FOR NEGLIGENCE**

65. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

66. Having entered into a Joint Prosecution Agreement with Airlines, Defendants were duty bound to conduct themselves in a fashion calculated to achieve victory for both plaintiffs in the consolidated veil piercing cases. As previously set forth herein, Defendants' self-interested and reckless conduct, in breach of the Joint Prosecution Agreement, caused summary judgment to be entered for Soros and Chatterjee in both piercing suits.

67. The duty that Defendants breached ran to all foreseeable beneficiaries of a victory in the veil piercing suit, including Plaintiff Grayson. Plaintiff Grayson was economically damaged by loss of the veil piercing suit, and Defendants are liable for said economic damage to Plaintiff.

**SEVENTH CAUSE OF ACTION FOR LEGAL MALPRACTICE -**
**(DEFENDANTS RESSLER FIRM, WERTHER, AND BRUCE RESSLER)**

68. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

69. Having entered into a Joint Prosecution Agreement with Airlines, the Attorney Defendants herein - Ressler Firm, Werther, and Bruce Ressler - were duty bound to function competently and diligently as attorneys, so as to achieve victory for both plaintiffs in the consolidated veil piercing cases. Defendants' duty ran to Grayson, among others, because she is a beneficiary of the Joint Defense Agreement.

70. The Attorney Defendants - Ressler Firm, Werther, and Bruce Ressler - breached their duties and committed legal malpractice, by ousting Grayson shortly before the close of discovery, causing her to be replaced with indifferent and disoriented counsel, failing to make use of discovery to unearth critical evidence, and responding to the summary judgment motion filed by Soros and Chatterjee in grossly

incompetent fashion. As a consequence of this legal malpractice, the summary judgment motion was lost, and Grayson was deprived of her contingency fee. The Attorney Defendants are consequently liable for Grayson's lost contingency fee.

**EIGHTH CAUSE OF ACTION FOR CONVERSION**

71. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

72. As previously set forth, Defendants took delivery of Grayson's deposition transcripts from the *Jet Star* case, conditional upon a promise to copy the transcripts and promptly return the originals to Grayson. Defendants breached their promise to copy and return the transcripts. Defendants retained the transcripts, converting the transcripts to their own use, and permanently depriving Grayson of the transcripts.

73. In converting and stealing Grayson's transcripts, Defendants acted with wanton malice and disregard for the property rights of others.

74. The transcripts were Grayson's valuable property. Grayson was damaged by their conversion to Defendants' use, while Defendants benefitted from the conversion. Grayson should therefore be awarded compensatory and punitive damages for conversion of her *Jet Star* deposition transcripts by defendants.

**NINTH CAUSE OF ACTION FOR TRESSPASS TO CHATTLE**

75. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

76. By depriving Grayson of her *Jet Star* deposition transcripts, Defendants trespassed against Grayson's chattel. This trespass to chattel was damaging to Grayson and beneficial to Defendants.

77. In trespassing against Grayson’s chattel, Defendants acted willfully, with malice, and with wanton disregard for Grayson’s property rights. Grayson is therefore entitled to compensatory and punitive damages from Defendants for trespass to her chattel.

## TENTH CAUSE OF ACTION FOR PRIMA FACIE TORT

78. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

79. Plaintiff pleads, in the alternative, a cause of action for *prima facie* tort. If Defendants’ motivations were not as previously described herein, and Defendants acted, instead, out of disinterested malevolence, they are liable to Grayson for actual and punitive damages under a theory of *prima facie* tort.

## PRAYER FOR RELIEF

**WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANTS, AND EACH OF THEM, ON ALL CAUSES OF ACTION, AS FOLLOWS:**

1) Awarding compensatory damages in a sum not less than $20 million;

2) Awarding punitive damages, if and as provided by law, and per proof at trial;

3) Awarding fines and interest per any and all applicable statutes;

4) Awarding such other and further relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

S/s_______________________________

Violet Elizabeth Grayson
Plaintiff *In Propria Person*