UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VIOLET ELIZABETH GRAYSON,

Plaintiff,

v. 15 CV 8740 (ER)

RESSLER & RESSLER, ET ALL.,

Defendants.

------------------------------x

New York, N.Y.
July 12, 2016
11:01 a.m.

Before:

HON. EDGARDO RAMOS,

District Judge

APPEARANCES

VIOLET ELIZABETH GRAYSON, ATTORNEY AT LAW, PRO SE

RESSLER & RESSLER, PRO SE
Attorneys for Defendants
BRUCE J. RESSLER
ELLEN R. WERTHER

(In open court)

(Case called)

MS. GRAYSON: Violet Elizabeth Grayson, in propria persona.

MS. WERTHER: Ellen Werther, pro se, from Ressler and Ressler, counsel for all defendants.

THE COURT: Good morning to you all. This matter is on for a pre-motion conference at the request of the defendants; however, this was the first time that this matter has come before me; so, Ms. Grayson, let me begin with you. Why don't you give me a nutshell of what this case is all about, and you can remain seated, by the way.

MS. GRAYSON: This is a case for defamation, interference and tortious interference with business relations, tortious interference with a contract and a wide variety of other torts arising from a situation in which I was representing one party in a case pending before Judge Keenan, Ms. Werther was representing another party, and Ms. Werther induced my client to terminate my representation of my client in the matter pending before Judge Keenan.

THE COURT: Okay. Now, I understand that there's some lengthy procedural history to what brings us here. Did this all start because of some litigation concerning an airlines in Florida?

MS. GRAYSON: Oh, yes. That was the matter before

Judge Keenan. I represented Tradewinds Airlines in that litigation, which was against George Soros and Purnendu Chatterjee.

THE COURT: Individually?

MS. GRAYSON: Yes, individually. And I commenced the representation prior to my client filing for bankruptcy protection. I was then retained to represent the debtor-in-possession in chapter 13. I was retained, after it was converted to Chapter 7. I was retained to represent the trustee in Chapter 7, and very late in the litigation, when the four-month discovery period had already commenced, the defendants in this action induced my client, the Chapter 7 trustee, to terminate my representation of Tradewinds Airlines.

THE COURT: And that bankruptcy proceeding was filed in North Carolina, I believe?

MS. GRAYSON: It was filed in Florida. Apparently, the airline was in North Carolina, was in Greensboro, but it's apparently quite common for airlines filing bankruptcy to file the actions in the Southern District of Florida. There's a particular judge there, AJ Cristol, who does a lot of airline bankruptcies and seems to bring some expertise to that.

THE COURT: A lot of forum shopping going on in the airline bankruptcy industry?

MS. GRAYSON: It would seem that way, yes.

THE COURT: Ms. Werther?

MS. WERTHER: Your Honor, I'm here with Bruce Ressler, also from Ressler and Ressler, also representing himself pro se and all defendants, and I'll have him handle this, if that's okay with you.

THE COURT: Very well. Mr. Ressler, you can also be seated. Just speak into the microphone so that we can hear you.

MR. RESSLER: Okay. As we state in our letter of July 7th, this is a situation where the trustee for Tradewinds fired Ms. Grayson, and she was quite upset about that and, therefore, she made application in the bankruptcy court for fees and she also brought this lawsuit. In the lawsuit, she originally sued her client and all of the professionals retained by her client, and she also sued me and my firm and my clients saying that --

THE COURT: Your clients were who?

MR. RESSLER: My clients were -- well, individually was Richard Ressler, but Orchard Capital was actually his business entity, and we also had certain organizations Coreolis and Coreolis Holdings. They were all part of the veil-piercing actions. We were co-plaintiffs with Tradewinds.

So after Ms. Grayson was fired by her client, she sued her client, those professionals. She sued me, she sued my law firm, she sued my partner, she sued my brother, who is the principal of Orchard Capital, and she alleged that we were

involved in some conspiracy to get her fired.

And because the Tradewinds entity was in bankruptcy, the jurisdiction was exercised by Judge Cristol down in the Southern District of Florida in that bankruptcy court, and he informed her that what she was doing was improper. She could not sue the trustee and/or his professionals outside of the bankruptcy court, and she understood that she was facing sanctions if she proceeded with such a lawsuit. Therefore, understanding the gravity of the situation, she let them out of the case.

Thereafter, when this case returned to the jurisdiction of the bankruptcy court, Judge Cristol recommended that those parties go to mediation and see if they could resolve her claim for attorney's fees now that she had been fired. She originally tried to resist the trustee in firing her, but Judge Cristol, in a prior proceeding, explained to her that this was the decision of the trustee and he could, in fact, fire her, and she gave up on that quest.

Then she came back, as I said, with an effort to get some attorney's fees, and Judge Cristol recommended that they go to mediation, court-sponsored mediation. You know, she had a claim for $20 million, and that's a serious claim on its face. Then, I understand that was recently settled on an interim fee application for $90,000, subject to certain claw-back provisions that are not relevant to this proceeding.

That was not satisfactory to Ms. Grayson; so she has continued her quest in this lawsuit, and she says that Ms. Werther and I, cutting to the chase, had a meeting with Robert Mayer. Robert Mayer, of course, is an attorney for the trustee, and at that meeting, we did essentially two things. We showed him certain financial information about Ms. Grayson, and we defamed her in terms of her ability as a lawyer, and these two things convinced him or induced him to recommend to the trustee that she be fired.

This allegation in the complaint was surprising to us; so we called Robert Mayer and said -- you know, explained the situation to him and said, is any of this true, because I don't remember that from our meeting. And he said, of course it's not true. I said, would you offer a declaration to the court in New York explaining that? And that is the declaration of Robert Mayer that we sent to you with our letter.

You know, what more can you say? I think, looking around this room, I think it's fair to say that I've been practicing law longer than anybody in this room, and I think the system, it's not perfect, but it works pretty well. But the main thing, the primary thing that makes this work is if lawyers follow the rules, especially lawyers. It should be everybody, but especially lawyers, and that first rule is to tell the truth, and there is nothing, nothing in that complaint which is true.

She has made allegations against Orchard and Richard Ressler. I don't even know if she's ever spoken to him, other than to say hello, and she makes no allegations against them in the complaint, yet includes them. She says that we had a secret meeting with Robert Mayer and produced certain financial information. I don't even know what she's talking about. I don't think I've ever obtained any such information in the course of my 40 years of practice.

In regard to defaming her, as Robert Mayer says, we haven't. We didn't then and we haven't since. She was fired by her client for reasons that her client explained to her in a letter that Judge Cristol asked them to send to her, and I asked Mr. Mayer about that because that was not shared with us, and he said, we gave the reasons. We weren't induced to do it by anybody. We acted in the best interest of the estate.

THE COURT: I take it that letter is not part of the public record in the bankruptcy proceeding?

MR. RESSLER: I'm sorry?

THE COURT: That letter is not part of the public record in the bankruptcy proceeding?

MR. RESSLER: Not the public record.

THE COURT: Okay.

MR. RESSLER: So that these allegations are so highly improper, that I think for the first time in my career I seek to make a rule 11 motion. Obviously, we have our remedies in

terms of motions to dismiss and other things that are more usual, but in this situation, where the plaintiff is a lawyer, who knows better, this is not a mistake, it could be, or something like that, she knows what she's saying is not true. In that situation, we seek to hold her accountable, if she is not going to do the right thing and come into this court with clean hands.

THE COURT: You removed this case from state court, correct?

MS. WERTHER: There's another case pending now that we filed in North Carolina. Yes. Oh, you mean this? I'm sorry.

THE COURT: Yes.

MR. RESSLER: I understand. Yes.

THE COURT: What's the basis for federal jurisdiction now?

MR. RESSLER: Now that I see that -- based upon what Mr. Mayer told me, there is no basis of federal jurisdiction.

THE COURT: What is the alleged basis?

MR. RESSLER: These financial records that we apparently produced and gave to Mr. Mayer, which he said and which we say we never got, we never gave them to him.

THE COURT: Okay. Ms. Grayson?

MS. GRAYSON: Yes, your Honor. We've heard that certain things aren't true, that allegedly the allegations of the complaint aren't true. I think if one wants to take a

quick, you know, sort of a core drilling on what's true and what's not true, it would be useful to compare the pre-motion letter, which was sent to this Court about a week ago, with making certain characterizations of the partial settlement reached in Florida, with the partial settlement, I'd be happy to supply the Court with a copy of the settlement, and it will be immediately apparent that the factual statements in the pre-motion letter about the settlement and the settlement don't equate; that the settlement is very different from the characterization.

And I think that is a quick way to give the Court some sense that what I'm saying is true and that what the defendants are saying is untrue. Although, this is really not a time in the proceedings to go forward with, you know, trying to prove what's true and what's not true. That happens later. What we really need to do right now is take a look at the pleadings and see if they are facially sufficient in their current condition, or if they need to be amended in any way.

And the characterization of the settlement conference really isn't accurate. It wasn't something that Judge Cristol asked for. It was something that I suggested, and it narrowed the issues in some ways. It didn't resolve the issues, but it narrowed them.

THE COURT: But it is true, is it not, that you at least settled with the trustee, was it?

MS. GRAYSON: No, it's actually not true, and maybe I should send the Court a copy of the agreement. What we did was we eliminated certain issues in the dispute. First of all, the two disputes are not exactly coterminous.

THE COURT: Tell me what the two disputes are before we go further.

MS. GRAYSON: After I was terminated -- Let me go back to this letter that was written to the bank that's on file on Pacer. When my client fired me, which I believe was on 2003, I think it was, August 18th or 19th, right in there, the client sent me a letter saying why are we firing you, when we've had you representing us for four-and-a-half years and the case is nearing the end of the discovery period, and there were a list of reasons.

The first reason given was that I'm a solo practitioner and they wanted a large firm, and that didn't make a whole lot of sense because they knew I was a solo practitioner when they hired me, and they knew I was a solo practitioner throughout the four-and-a-half years that I represented them.

The second reason listed was that I was not getting along with Ms. Werther, and I got this letter stating that I was being terminated for failure to get along with Ms. Werther, I believe it was four days after there was a -- you can call it a secret meeting between Robert Mayer and Ms. Werther and

Mr. Ressler. It wasn't exactly secret. It was a meeting at which the subject was whether I should continue to represent Tradewinds Airlines. And Mr. Mayer had requested that we all be present, myself and Mr. Ressler and Ms. Werther, and they stated that they would only meet with him if I was not present. So he went into that meeting --

THE COURT: I'm sorry, and you were present for this?

MS. GRAYSON: Mr. Mayer told me that they had said that they would only meet with him in my absence, that's what Mr. Mayer told me, that they would only meet with them in my absence. And I know the meeting, in fact, occurred because he spoke with me before, and he walked with me to the office, I believe it's 44 Wall Street, to the Ressler law firm office. And I saw him go into the building and, you know, we'd been on a pretty positive tone until then.

And he called me late that night, after he'd returned to Florida from New York, and he said: Ellen wants you out, and she said this and this and this, which is the contents of my -- contents of the complaint.

And then, a few days later, I got a letter stating that I was being fired, and the first reason listed was that I was not a large law firm; and the second reason listed was Ms. Werther, that she didn't like me, didn't get along with me. So I don't think -- and that is a matter of public record. It became a matter of public record because, for some reason, the

bankruptcy trustee filed it with the court; so now it's on Pacer.

THE COURT: Now, talk to me, if you will, about the action that brings us to Federal Court.

MS. GRAYSON: Yes. Mr. Mayer, in that late-night phone call after his meeting in the afternoon at the Ressler law offices, told me that the Resslers had gathered financial information about me that was a reason why I should be fired, and that they'd run a credit check and that that was one of the reasons I was going to be fired.

And, in fact, in the letter, which I received from the Chapter 7 trustee, reason three for firing me was that I, quote, had not been frank about my finances, or I believe that's pretty much a direct quote. So I believe that also was causative of the damage to me, and I believe that the damage was that the collection of my credit information and its use was violative of federal statute.

THE COURT: Is that something that Mr. Mayer told you that he was provided by the defendants, or something that you assumed, based on the fact that he told you that?

MS. GRAYSON: He told me.

THE COURT: Okay. Okay. Very well. Mr. Ressler? Again, whatever makes you most comfortable. Feel free to remain seated.

MR. RESSLER: It's just habit. Judge, Robert Mayer is

a man who has practiced law for 30 years. In paragraph 6 of his declaration, he deals with this memory of Ms. Grayson that Ms. Werther or I presented some type of financial or credit information. He doesn't mince words. He's not evasive. He states specifically, never happened, and he is not thrilled with what Ms. Grayson says now.

And in discussing this with him the other day, he gave me his phone number and he said: When you go to court at 11:00 this Tuesday, if the judge wants to give me a call to see if I'm lying, if I've presented a perjurious declaration to the U.S. District Court for the Southern District of New York, he can call me and ask me.

I don't know if that would be something that you would want to do, but what Ms. Grayson is suggesting is not only -- it's outrageous as to us, but now she's accusing Mr. Mayer of lying, Ms. Werther of lying, of me lying and she -- without any evidentiary support, this is -- this is beyond the line. Any lawyer can make any good-faith argument and let it roll. You just go in there present your evidence and give it your all, but not this. This is unfortunate conduct that should not be tolerated by this Court or any court. She knows it, and this litigation by extortion should not be -- should not be permitted.

THE COURT: So what do you want to do, Mr. Ressler?

MR. RESSLER: I want this case -- frankly, I would

like the case dismissed now and everybody go on. I don't want to make a rule 11 motion. I don't want to make a motion to dismiss that indicates inaccuracies of the complaint or whatever else there might be. It is a waste of the time of this Court, all the parties. It's an insult to the bankruptcy court. It's just an outrage. It's an outrage.

THE COURT: Well, look, I've reviewed the file and the letters, and here's where I sort of come out preliminarily. Even if you're right, at the end of the day, I don't know that I can make that determination based on the record that's before me. I mean, I've read Mr. Mayer's declaration. I don't know that it's appropriate for me to consider it. Certainly not on a 12(b)(6), arguably on a 12(b)(1) motion.

However, that is not a letter that goes to whether or not I have jurisdiction. It's a letter that goes to the credibility of the parties, the merits, if you will.

MR. RESSLER: I agree.

THE COURT: So if you were to make the motion based on that, you will likely lose that motion. If that is the basis for federal jurisdiction, I think that this case is going to have to go forward and develop the factual record more fully so that I can take everything into account.

As, you know, to you, Ms. Grayson, you have the Mayer affidavit. I mean, again, I'm not going to make any determination today as to credibility. That's not the purpose

that we're here. That's not the function under the federal rules. That's not what I am required to do under the federal rules. But now you have a representation that, in fact, Mr. Mayer was not given the information that you recall him telling you that he had received and, therefore, you might want to consider -- and, again, I'm not telling anyone what to do or how to prosecute this case or defend this case -- you may want to consider whether or not you want to go forward with that allegation.

MS. GRAYSON: I think the most useful thing I can do at this point is take discovery, and the two key things that come to my mind first are, I understand that there are contemporaneous notes that Mr. Mayer took at that meeting, and I think that once I have the notes and I depose him with the notes, as well as with whatever discoverable e-mails I can get from that period, I think we'll have a much more detailed feeling for this.

Right now, he's very angry. He was enraged when he was sued. He wouldn't even look at me when we went to that mediation in Florida and, you know, I think that he seems anxious to inject himself into this matter, even giving his phone number and I just --

THE COURT: I'm sorry, was he sued?

MS. GRAYSON: He was sued and, of course, he's enraged. But I think he's partisan at this point, but I think

when we look at his contemporaneous notes and the written facts and he is deposed because there's no debate that the meeting happened, that he went there, that the subject was whether I should be fired and that the meeting went on for hours and, you know, maybe he's saying that they said nothing defamatory, but certainly you can even look at footnote two of the pre-motion letter, there's some venom here.

In any event, it is a matter of fact and it's a matter of credibility, and I don't think we're here today --

THE COURT: And the stuff in footnote two, is that true?

MS. GRAYSON: I explained what happened.

THE COURT: Yes, but is it true?

MS. GRAYSON: Is it --

THE COURT: Factually true?

MS. GRAYSON: The two word quote is true, and it is also true that the order in the California case exists. So I suppose they're not defamatory from the standpoint that it's false. However, it was a relevant matter inserted out of context for the purpose of doing harm, and I think it shows intent. It's not actionable. It wouldn't be actionable anyway because it was sent to a court. Plus, it's not defamatory because there's no falsehood.

However, it shows a willingness, a desire and a venom to sway you through irrelevant matter and through generally

besmirching my character, but anyway, that's credibility stuff, and it's really not for today.

So I think what's important is that we do move forward with the discovery, and I know that it's the practice of some chambers in this courthouse, to have discovery and a complete pretrial schedule during the pendency of a rule 12 motion. We don't have a rule 12 motion now, but I imagine we'll have one soon.

And I believe some chambers do not have discovery in a complete pretrial schedule during the pendency of a rule 12 motion. In the event that this chambers is disposed to grant a full schedule and grant opening of discovery, I did bring down a proposed schedule.

MS. WERTHER: If I could be heard, your Honor?

THE COURT: You may.

MS. WERTHER: I think what Ms. Grayson has proposed today was done. Judge Cristol, Mr. Mayer, the trustee himself, and all the other persons that were part of the bankruptcy process -- Judge Cristol held a hearing when Ms. Grayson first sued all of us and was stunned to find that the trustee, Mr. Mukamal, individually, as well as in his official capacity, and all of his professionals in their firm capacity, in their individual capacity -- the caption was quite lengthy -- had been sued without bankruptcy court permission.

During the course of that hearing, he explained the

nature of the sanctions that would be imposed if the complaint were not -- a violation of the Barton doctrine, a version of the automatic stay -- if the claims against these protected persons was not withdrawn, including criminal sanctions.

Lo and behold, the complaint against them was withdrawn. At which point, Coreolis and my clients, Mr. Ressler and me personally, we said to Judge Cristol, look, this is leaving us out to dry because what's going to happen is we're going to get proceeded against separately. We have no role in the bankruptcy case. We're a creditor, but that has nothing to do with anything else.

We never represented the trustee. We were simply co-counsel in a consolidating action. We had our own case in front of Judge Keenan, which he consolidated for procedural purposes to make it easier for the parties and for the Court. We have separate clients. We had a separate claim. Fine.

Judge Cristol says, no, I can't do that because technically Coreolis, on that side, you have nothing to do with the bankruptcy estate. You're not protected by the estate. However, if Ms. Grayson wants to conduct discovery in New York concerning the claims against you and involve the trustee or any of his professionals, I will not permit that because I want to protect the estate. We can provide your Honor with a copy of Judge Cristol's order this afternoon. It's a matter of public record.

Now, in addition, your Honor references this letter that Ms. Grayson has from the trustee --

THE COURT: I'm sorry. Mr. Mayer works for the trustee?

MS. WERTHER: Yes, first, he represented the trustee in its official capacity. He left that law firm. Now he represents the trustee in his individual capacity and continues to do so to this days. He is, in fact, lead counsel.

Now, because Ms. Grayson was asking the bankruptcy court, back when she was resisting her termination, to at least allow her to obtain discovery from the trustee, and over many objections about the burden on the estate and the impairment of certain claims that the trustee has against third parties, which are the subject of litigation, the following order was entered. Again, I can send it to your Honor.

The order provides that the trustee shall give Ms. Grayson a detailed explanation of precisely why she was terminated, that Ms. Grayson may not file that in any court and may not show that to any person without prior order of Judge Cristol. He asked us, on the Coreolis side, to do the same. Of course, we submitted --

THE COURT: I'm sorry, to do what?

MS. WERTHER: The same, explain our understanding of why Ms. Grayson was terminated. It's easy, we did not know. We did not fire her. We did not recommend that she be fired.

We advised the trustee that the process of this consolidated action was at a critical juncture because Magistrate Peck, who had conducted discovery, runs his famous rocket docket and things were about to move things quickly.

He was telling us he was changing counsel, and we said, look, we need to know what you're doing because Judge Peck has discovery orders in place, and I'm going to be hauled in front of Judge Peck and explain why things aren't getting done, and I need to know who my co-counsel is. That was pretty simple.

The other issue was the expenses. The expenses in that matter were massive. It's a matter of public record that they exceeded $600,000, which we and Ms. Grayson's replacement counsel paid individually. We financed that case.

The problems that we were having was not any secret. Ms. Grayson did not pay her expenses, and she had advised us she couldn't. We never -- I have never in my life obtained a credit report on anybody, other than my elderly, sick father, to make sure he was okay. I handle his affairs. No one.

Mr. Ressler will give the same statement.

Mr. Mayer has told you quite clearly that that never occurred. I have no idea if anybody else obtained credit information on Ms. Grayson and gave it to the trustee. What I do know is that we never did, and that is the whole basis of this Court's subject matter jurisdiction. Now, I have not been

practicing law as long as Mr. Ressler, but I've been practicing law for 38 years, and I have never, in my professional career, seen anything like this.

Now, I gather, your Honor does not wish to take any firm action today, but we seek leave to at least serve Ms. Grayson with a formal rule 11 motion, laying out the factual basis as to why her statements are plainly untrue, and she then has a choice, after the 21 days provided for in the statute. She can either withdraw her complaint on which the entire causes -- they all turn on those two allegations, or she can proceed at her own risk.

Once we find out whether or not Ms. Grayson has seen the light, at that juncture, we will then file a motion to dismiss under 12(b)(1) and 12(b)(6), as well as our rule 11 motion, after we wait our 21-day safe harbor provision. And I respectfully recommend to your Honor that we follow the rules as they're laid out, and I think, hopefully, Ms. Grayson will see the light at that juncture.

THE COURT: Ms. Grayson?

MS. GRAYSON: Yes, one thing that may have gotten lost in that rather long presentation was the fact that there was a motion. There was a motion to relieve -- well, to prevent me from proceeding outside the bankruptcy court against Mr. Ressler, Ms. Werther, Ressler and Ressler and the other parties, and that was denied.

There was an opinion from Judge Cristol. He denied it, and I believe that I sent a copy to this Court when it was issued. There was also a motion for reconsideration, which was denied. And there was a request that I dismiss the trustee and his professionals with prejudice, which was denied.

I think we need to look at it from that standpoint. I think that discovery is controlled out of this Court, not out of Florida. I would add that Mr. Mayer has actively injected himself as a witness in this matter and that, therefore, I think that, all the more so, he shouldn't be allowed to resist discovery.

Regarding scheduling, I don't know whether this Court is going to authorize the filing of a rule 11 motion. I think if it is to be authorized, I don't think it should delay the filing of the rule 12 motion. There was a stipulation for a 60-day continuance in filing of the rule 12 motion. Ms. Werther contacted me, she said, in essence, she was busy this summer and had conflicting obligations and would I be amenable to a 60-day extension. I agreed to it.

I think the time has come for them to file that motion, and I think the time has come for us to have some discovery, and I think we should move towards the merits. Thank you.

MR. RESSLER: Before we embark on some discovery schedule, I would prefer strongly not to file a ruling of Judge

Cristol. If there is discovery taken of a Tradewinds professional, which would include, obviously, the trustee, Mr. Mayer, and anyone else that Ms. Grayson wants to depose, we must go -- we must go to Judge Cristol.

We were before him. He gave a ruling. That ruling might be wrong, that might be overruled by you, a lot of things could happen to that ruling, but I cannot ignore a ruling from another judge.

THE COURT: What is the ruling, exactly? Because I know that there's a ruling, apparently, that the letter that was provided to Ms. Grayson can't be shared. Is there some limitation beyond that?

MS. WERTHER: Yes, there is, your Honor. In denying the motion for reconsideration, I believe it is -- I believe it was sent to your chambers; we'll send you another copy -- Judge Cristol rejected the argument that -- we had argued that we should be protected by the stay because discovery proceeding against us would inevitably lead, which apparently it is, to discovery by Ms. Grayson against the trustee and his professionals.

And Judge Cristol said: No, it won't, and in effect over my dead body because I will not permit that to occur. And that is at the last page of his -- I think it's denial for the motion for reconsideration. It will be one of those two motions. I will have it to your Honor this afternoon.

So under the circumstances, given that Judge Cristol has made abundantly clear that Ms. Grayson cannot conduct discovery of those professionals without his prior permission, we are suggesting that she is obligated by pending court order to do so.

MR. RESSLER: Judge, just to be clear, Judge Cristol, he understood the inherent conflict. You know, if you resolve the claim as to the professionals and we're not covered by the Barton doctrine, what's going to happen. It was his expectation that the mediation would resolve the entire situation.

We tried to explain to him it was unlikely to do that, but he was of a different view; so that now, we're faced with exactly the situation that we explained to him.

The procedure, as we understand it, is before there can be any discovery beyond us -- and she can depose us, obviously -- but if she wants to take the critical discovery from the only other person who was at that meeting, Mr. Mayer, and if she wants to take discovery of Mr. Mukamal to ask him why the firing, despite having the letter from Mr. Mukamal, she has to go to Judge Cristol and make the appropriate application. If not, I would be engaging in something that I know another court has told me not to do.

MS. GRAYSON: May I?

THE COURT: You may.

MS. GRAYSON: Thank you. There is, in one of the orders, I forget whether it was Ms. Werther or Mr. Ressler, which was the order denying their motion for reconsideration. There is a one-sentence line that says, of course, Ms. Grayson won't be deposing the trustee and his professionals.

And it's -- I don't know, to be really honest, I have very high regard for Judge Cristol, I like him enormously and there's no disrespect intended here, but I don't know whether he has jurisdiction to control what discovery I take in this case, and, you know, I'd be curious to see what this Court thinks. I don't want to offend him. I don't want to do anything wrong. I think he probably doesn't have jurisdiction to do that.

Also, when he made that order, the trustee had been ordered to give me all of the documents pertaining to my termination, and that changed. With the partial settlement, that changed, but we were already in a situation where they were supposed to be giving me all of the documents.

Finally, I would add that I think that Mr. Mayer's injecting himself into this matter, filing a declaration when he had no obligation to do anything, offering his phone number, I think he's injected himself to such a degree that that's certainly a reason I should get his notes and to depose him, and I think that's probably it. Thank you.

Does the Court have any more questions?

THE COURT: No, no, I don't, but we'll have to talk about how we proceed. You know, I think you're probably right that Judge Cristol can't order me to do one thing or another. But it's also the case that I am a member of a judiciary, a federal judiciary that, at a minimum, respects the orders of other courts, even if they don't necessarily compel me to do one thing or another.

It's also the case that I think I have to be careful, when faced with the situation that I'm faced with here, to ensure that litigants are not bringing litigation in other jurisdictions in order to avoid maybe the direct rulings of another federal judge. I don't know. I'm not suggesting that that's the case, but it's certainly something about which I should be, at the very least, concerned.

So I think what we need to do, since I don't believe I've read Judge Cristol's order, I'm directing that no discovery be taken of the trustee or his employees. I will need to take a look at that. In any event, I am not inclined to let discovery proceed pending whatever rule 12 motion may be made.

Now, with respect to the rule 11 motion, if you want to make the motion, I can have no authority to prevent you from making it. So if you want to make it, go ahead, if that's what you believe you need to do.

With respect to the rule 12 motions, you've got my

preliminary view as to whether or not such a motion is likely to be successful, but I will leave it to you whether or not you wish to make that motion as well.

I'm happy, given the posture of this case, if you will, to consider some additional time for you to consider making that motion. So I will ask you in the first instance what it is that you want to do?

MR. RESSLER: In light of your preliminary impression, we would like to have some more time to consider this. It's now -- could we have 90 days? And, at that time, we will -- and we will make every effort in those 90 days not to make any of these motions, but we need to consider that. We've got to talk to our clients also.

It's a difficult time because of the summer and all that, but within 90 days we hope to have a consensus. We'll also speak with Mr. Mayer and the trustee, and we will also attempt to get his advice on approaching Judge Cristol so that we can coordinate.

So, for instance, if we decide not to make any motions and just to proceed to discovery, I'd like to get a feeling from Mr. Mayer, and that might take him a little while, but I'd like to get a feeling from him as to what discovery can reasonably be done in this case so as not to offend Judge Cristol -- in light of what you just said about another federal judge issuing an order -- you know, what's Judge Cristol's

feeling now, in light of the fact of the posture of this case.

And I think those discussions with Mr. Mayer and perhaps his approach to Judge Cristol is something that would be very important, and we could, in fact, report back to this Court about those things, and we'll do that within 90 days.

THE COURT: Ms. Grayson?

MS. GRAYSON: 90 days does seem like a rather long time. That would give us six months between the filing of the complaint and the filing of a rule 12 motion, if there is a rule 12 motion. Plus, I won't be around in the second half of October, in all probability, so that I wouldn't be able to work on it in those two weeks.

If the Court thinks it's appropriate, I guess they can be given until November 1, or if the Court would like to get the case moving, it should be briefer. I certainly would appreciate that if there's so much delay at the beginning, that when we do get rolling, we set pretty reasonably tight discovery schedule and tight trial date and so on. I'd like to get this resolved.

MR. RESSLER: That's agreeable to us. November 1st and then tight discovery schedule thereafter.

THE COURT: Very well. Okay. So let's do that. I would ask the defendants to give me a copy of that Judge Cristol order, and again, if you want to move forward to rule 11, you can file your letters as soon as you're ready.

So November 1, let's set it down for a status conference for on or immediately after November 1.

MR. RESSLER: Yes.

THE COURT: If the parties reach some sort of either agreement or have an understanding of how we're going to proceed, I would appreciate a report prior to that date so that we know what we're doing.

MS. GRAYSON: I'm not sure I'll be here on November 1. Can we do it a little later that week?

THE COURT: Yes, absolutely. Whenever the parties are ready.

MS. GRAYSON: I'll consult my calendar, and I'll consult the defendants, if that's all right.

THE COURT: That's fine.

MS. GRAYSON: And would the defendants be amenable to forwarding to the Court both of Judge Cristol's orders, the original one declining to -- Judge Cristol denied a motion under the Barton doctrine, and then he denied reconsideration. I think it would be useful for the Court to have both the original order and then the subsequent order denying reconsideration. Are the defendants amenable?

MR. RESSLER: Do you have the dates of those?

MS. WERTHER: I believe they were already filed with the Court, your Honor, but it's easy enough. Your Honor, when I get back to the office, I'll send you additional copies, as

well as a copy of the order precluding the letter that sets forth the reasons for Ms. Grayson's termination from being made public.

THE COURT: Very well. I'll look forward to receiving that and we will not put down a date for a subsequent conference, but I will ask the parties to get back to chambers by no later than the end of business of tomorrow with an agreeable date and time.

MS. GRAYSON: Perfect, your Honor. Thank you.

MR. RESSLER: Your Honor, would it be acceptable to this Court if I asked Mr. Mayer to make some type of application for this Court to make an in camera inspection of the letter that the trustee sent to Ms. Grayson about reasons for termination? Obviously, we can't see it, for reasons the that Judge Cristol made.

THE COURT: I don't know that I want to get involved in the merits at this point. But I would encourage the parties, because the defendants have raised what appears to be a non-frivolous basis for a rule 11 motion, I would encourage the parties to discuss, you know, to the extent that you can, the nature of the evidence or lack of evidence, and to discuss whether or not it is appropriate, given your discussions, whether it is appropriate to go forward with that allegation.

MR. RESSLER: Okay.

THE COURT: Okay. Is there anything else,

Ms. Grayson?

MS. GRAYSON: No, your Honor.

THE COURT: Ms. Werther?

MS. WERTHER: No, your Honor. Thank you.

THE COURT: In that event, we are adjourned. Please do get back to chambers by end of business tomorrow.

MS. GRAYSON: Thank you.

MR. RESSLER: Thank you, Judge.

THE COURT: Thank you, folks.

(Adjourned)