UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                              :
                                              :
                                              :
VIOLET ELIZABETH GRAYSON,                     :        Case No. 1:15-cv-08740-ER
                                              :
              Plaintiff,                      :
                                              :
         -against-                            :        **FIRST AMENDED
                                              :        COMPLAINT**
                                              :
                                              :        JURY TRIAL DEMANDED
RESSLER & RESSLER, ELLEN WERTHER,             :
And BRUCE RESSLER,                            :
                                              :
                                              :
                                              :
                                              :
              Defendants.                     :
---------------------------------------------------------------x

Violet Elizabeth Grayson, for her First Amended Complaint, alleges:

### INTRODUCTION

1. Defendants, through their tortious machinations and defamatory statements, deprived Plaintiff attorney of a multi-million dollar fee in a contingency case, and injured Plaintiff's professional reputation. They have also breached their agreement with Plaintiff, wrongfully appropriated Plaintiff's work, unlawfully deprived Plaintiff of the fruits or her efforts, and are enriching themselves at Plaintiff's expense. Plaintiff's defamation cause of action, and related state law causes of action, are set forth below. Plaintiff seeks both compensatory and punitive damages.

### PARTIES, JURISDICTION, AND VENUE

2. Plaintiff Violet Elizabeth Grayson ("Grayson") is a licensed attorney, and a citizen of the State of California.

3. Defendant Ressler & Ressler (the "Ressler Firm") is a small law firm with its principal place of business in New York County, New York.

4. Defendant Ellen Werther ("Werther") is a licensed attorney and a partner in the Ressler Firm. She is a citizen of the State of New York.

5. Defendant Bruce Ressler ("Ressler") is a licensed attorney and a partner in the Ressler Firm. He is also the husband of defendant Werther. He is a citizen of the State of New York.

6. As to all of the acts alleged herein, Defendants acted in concert.

7. This Court has diversity jurisdiction over the instant action per 28 U.S.C. section 1332, as there is complete diversity of citizenship between Plaintiff and all Defendants herein, and the amount in controversy exceeds $75,000.

8. Venue is proper in the Southern District of New York, as Defendant Ressler Firm has its principal place of business in Manhattan, and as most of the events giving rise to this action occurred in Manhattan.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. *Jet Star Case*

9. In 2005, Attorney Grayson was seeking to collect a multi-million dollar judgment that she had obtained for her client, Jet Star Airlines, against C-S Aviation Corporation, in the United States District Court for the Southern District of New York. C-S Aviation defaulted in Southern District litigation pending before Judge Deborah Batts, and closed its doors on the day when the resulting default judgment would have become collectible. The telephone number for C-S Aviation was

answered with a recording stating: "You have reached a non-working number at Soros Fund Management."

10. Grayson's subsequent investigation supported several alternative theories of recovery, including: (a) piercing the corporate veil of C-S Aviation to reach its principals, George Soros and Purnendu Chatterjee, or (b) recovering from a consortium of banks to whom C-S Aviation's assets appeared to have been fraudulently transferred. Grayson filed suit in the Southern District of New York, and the case was assigned to Judge Harold Baer.

11. The alternative theories of recovery -- fraudulent transfer or veil-piercing - placed defendants in a conundrum, insofar as the fraudulent transfer cause of action was best defended by urging that C-S Aviation had no assets, whereas such an admission tended to strengthen the veil piercing claim. The defendants prioritized defending the fraudulent transfer cause of action, and submitted in support of their motion for summary judgment, the declaration of C-S Aviation's last president, James Walsh, stating that C-S Aviation was designed as a management company, which had no assets of its own, but instead managed assets held by offshore special purpose companies. Thus, summary judgment was granted as to the fraudulent transfer claim and denied as to the veil piercing claim. Shortly thereafter, the case settled.

### B. Commencement of TradeWinds Airlines Case and the Chapter 11 Bankruptcy

12. In the spring of 2008, Grayson was contacted by the Tuggle, Duggins law firm of Greensboro, North Carolina. Tuggle, Duggins represented TradeWinds Airlines ("Airlines") in North Carolina state court litigation where C-S Aviation had

defaulted. Grayson and Tuggle, Duggins agreed that Tuggle, Duggins would obtain a default judgment on the strength of the default already entered, and that Grayson would then file suit against George Soros and Purnendu Chatterjee in the Southern District of New York to pierce the corporate veil of C-S Aviation, and recover the North Carolina judgment from Soros and Chatterjee. Grayson and Tuggle, Duggins agreed to split the 50% contingency fee from any ultimate recovery.

13. On June 27, 2008, Tuggle, Duggins secured a $54,867,872.49 judgment against C-S Aviation in North Carolina state court. On June 30, 2008, Grayson filed a veil piercing suit against Soros and Chatterjee in the Southern District of New York. This case was assigned to Judge John Keenan.

14. On July 25, 2008, Airlines filed a petition for Chapter 11 bankruptcy protection in the Southern District of Florida. A motion to employ Grayson and Tuggle, Duggins as Special Litigation Counsel, to continue their efforts to collect the default judgment, was filed in the Bankruptcy Court on August 20, 2008. On September 9, 2008, the motion was granted *nunc pro tunc* to the date of the Chapter 11 petition. The terms of retention were modified, with Special Litigation Counsel Grayson and Tuggle, Duggins to split a contingency fee equal to 50% of the first $15 million recovered, and 33% of any recovery in excess of $15 million.

### C. Intervention of the Ressler Firm, the Chapter 7 Bankruptcy, and the Disqualification Motion

15. On or about September 25, 2008, Grayson received a letter from the Ressler Firm asserting that some or all of the North Carolina default judgment belonged to the Firm's clients, TradeWinds Holdings ("Holdings") and Coreolis Holdings ("Coreolis"). Holdings was the former corporate parent of TradeWinds Airlines, and

was wholly owned by Coreolis. The letter was followed by a telephone call to the same effect. The position taken by the Ressler Firm was without merit, Holdings having relinquished its interest in Airlines years earlier.

16. Also in late September of 2008, counsel for George Soros contacted Grayson, and asserted that Grayson had violated the terms of the confidentiality agreement and/or the settlement agreement in the earlier *Jet Star* case, by representing TradeWinds Airlines in the newly filed piercing action. The assertion made no sense as Soros had retained for the *TradeWinds Airlines* piercing case, the same counsel who represented him in the *Jet Star* case.

17. On October 30, 2008, the *TradeWinds Airlines* Chapter 11 bankruptcy case was converted to a Chapter 7 case. The following day, Barry E. Mukamal (hereafter "the Trustee") was appointed as Chapter 7 Trustee.

18. Late in the day on November 11, 2008, Werther telephoned Grayson. Werther bad-mouthed the Tuggle Duggins firm, and urged Grayson to effectively switch sides and support Holdings' claims. She stated that she had retained North Carolina counsel to "blow up" Airlines' judgment, and that Grayson would be sorry if she did not cooperate. The following morning, Grayson contacted Tuggle, Duggins, the newly appointed Chapter 7 Trustee, and the Trustee's counsel, and recounted her conversation with Werther.

19. Werther made good on her threats. Coreolis filed a motion in North Carolina state court seeking revision of the default judgment. As a consequence of this motion, the default judgment (but not the underlying default) was vacated, and the matter set for discovery and trial, to determine what was owing to whom.

20. Werther also contacted the Chapter 7 Trustee, and attempted to persuade him to retain herself and the Ressler Firm in Grayson's place. The Ressler Firm, which represented Holdings and Coreolis on a contingency basis, sought to also represent TradeWinds Airlines on a contingency basis. How the Ressler firm proposed to handle any conflict of interest is unclear.

21. When Werther failed to persuade the Trustee to hire the Ressler firm, Coreolis filed opposition to the Trustee's motion to retain Grayson and Tuggle, Duggins as Special Litigation Counsel. Said opposition urged that Grayson should not be retained because Soros was attempting to disqualify her, and that Tuggle, Duggins should not be retained because that firm had obtained a default judgment for Airlines without informing counsel for Coreolis. The Bankruptcy Court was not persuaded by these arguments, and granted the Trustee's motion to retain Grayson and Tuggle, Duggins as Special Litigation counsel. The Bankruptcy Court also concluded that Holdings, Coreolis, and their counsel, had violated the automatic bankruptcy stay through their activities in North Carolina State Court, and enjoined further violation.

22. Although the Ressler Firm and its clients could not dissuade the Bankruptcy Court from approving retention of Grayson and Tuggle, Duggins, as Special Litigation Counsel, the Trustee *did* use Coreolis's Opposition as leverage for persuading Special Litigation Counsel to reduce their fees. As a consequence of interference from the Ressler Firm and its clients, the contingency fee of Special Litigation Counsel was reduced, in the Chapter 7 case, to 40% of the first $14 million recovered, and 33% of any recovery in excess of $14 million.

23. Meanwhile, George Soros filed a motion to disqualify Grayson as counsel for Airlines in the Southern District veil piercing litigation. Soros's co-defendant, Chatterjee, did not join in this motion. Chatterjee's counsel, Dustin Hecker, observed in a oral aside to Grayson, that he did not want to be disqualified himself. The logic of Soros's motion applied in equal measure to defense counsel, all of whom had served as counsel in the *Jet Star* case. The motion to disqualify was briefed and orally argued. On May 12, 2009, Judge Keenan denied the motion to disqualify.

### D. The North Carolina Damages Trial

24. In North Carolina, the parties proceeded with discovery, preparatory to a damages trial. During the discovery period, an agreement was reached between Airlines on the one hand, and Coreolis and Holdings on the other, that Coreolis and Holdings would seek their own, separate judgment against C-S Aviation, rather than attempting to obtain part of Airlines' judgment.

25. The damages case was tried in North Carolina state court in May of 2010. Grayson worked with Tuggle Duggins to prepare for the damages trial and during the damages trial. She was particularly instrumental in ensuring that affirmative defenses were not introduced to defeat the default judgments.

26. During the damages trial, Coreolis and Holdings introduced expensive expert testimony concerning what their interest in Airlines would have been worth under hypothetical circumstances. The trial judge rejected this testimony in his remarks at the close of the damages trial. Nonetheless, other evidence supported a judgment in favor of Coreolis and Holdings, for approximately $38 million inclusive of trebling

and interest. Airlines received a judgment of $56,134,104, also inclusive of trebling and interest. Both judgments were against defunct shell corporation C-S Aviation.

### E. The Coordinated Veil Piercing Cases and Co-Counsel Relationship

27. After receiving their own judgment from the North Carolina court, Coreolis and Holdings, through their counsel, the Ressler Firm, filed an action in the Southern District of New York, seeking to pierce the corporate veil of C-S Aviation and recover their judgment from Soros and Chatterjee. The complaint filed by the Ressler firm, on October 28, 2010, was a copy of the complaint filed by Grayson, with the names of the Ressler clients substituted in place of the name of Grayson's client. Judge Keenan consolidated the new veil piercing case filed on behalf of  Coreolis and Holdings with the extant veil piercing case filed by Airlines. In this way, Grayson and the Ressler Firm became, effectively, co-counsel. Werther, who is a commercial litigator and bankruptcy lawyer, played a more prominent role than her husband, who is primarily a personal injury and medical malpractice lawyer.

28. As soon as Grayson, Werther, and Ressler became, in effect, co-counsel pursuing parallel claims to pierce the veil of the same shell corporation, they agreed to work together, forming a special confidential relationship of trust. Grayson, who had, in effect, written the Coreolis Complaint, as well the TradeWinds Airlines Complaint, did most of the work for both coordinated cases, including first drafts of all major documents. There were several reasons for this. First, Grayson was far more familiar with the applicable facts and law. Second, Grayson was an exceptionally strong legal researcher and writer. Werther repeatedly complimented Grayson on the quality of her legal writing. Indeed, many years later, Trustee's counsel, Robert

Mayer, observed that Grayson wrote "beautifully." Thirdly, Werther and Ressler were overwhelmingly busy with a multi-district case involving automobile dealerships, and had little time to spare for the veil-piercing case.

29. Werther expressed much gratitude for Grayson's efforts. She told Grayson that she wished Grayson were her co-counsel on every case. Ressler and Werther both urged Grayson to move her law practice into the Ressler & Ressler law offices at 48 Wall Street in Manhattan. Werther and Ressler also had Grayson as a guest at their summer home on Fire Island for a weekend.

30. The agreement reached between Grayson, Werther, and Ressler, in the autumn of 2010, was developed by their subsequent conduct and dealing. It is to some degree evidenced by, but not fully embodied by, the Joint Prosecution, Common Interest, and Confidentiality Agreement, signed by them and other counsel in June of 2013.

31. Meanwhile, Soros and Chatterjee, acting on behalf of their shell corporation, C-S Aviation, pursued an appeal from the twin North Carolina default judgments. After the North Carolina Court of Appeal affirmed the default judgments, Soros and Chatterjee filed a request for North Carolina Supreme Court review. These procedural maneuvers played out over the course of three years. During this period, the Manhattan federal district court largely stayed discovery, but Judge Keenan permitted depositions of certain witnesses who were elderly or ill. The Manhattan federal district court did not authorize full document discovery in support of these depositions, but only production of documents authored by or sent to the deponents. This placed Werther at a disadvantage insofar as the other lawyers appearing in the

case had participated in the earlier *Jet Star* piercing case, and so understood the broader factual context, whereas Werther did not.

32. C-S Aviation's first President, Bharat Bhise, was deposed pursuant to Judge Keenan's order authorizing limited discovery. Grayson assumed the lead at the Bhise deposition. She selected, duplicated, marked, and presented the documents to be utilized in her examination of Bhise concerning his history as President of C-S Aviation. Grayson elicited much useful testimony from Bhise, including the statement that Soros took an "axe" or "hatchet" to C-S Aviation when he decided that he was no longer interested in the aviation business.

33. Disconnected from the broader factual context of the case, Werther became obsessed with proving, at the Bhise deposition, that C-S Aviation had no assets and was insolvent to the extent of being unable to pay a judgment. Werther's pet issue was not actually an issue at all, because, in the *Jet Star* case, the last president of C-S Aviation, James Walsh, filed a declaration stating that C-S Aviation never had any assets. Although the Walsh declaration was a matter of public record, Werther continued to obsess over the moot point. At the Bhise deposition, Werther demanded that inordinate time, in a time-limited deposition, be devoted to C-S Aviation's balance sheet, as opposed to gathering fresh testimony from percipient witness Bhise.

34. Werther was also determined to hire her long-time friend, attorney Martin Bienenstock, to render an expert opinion regarding C-S Aviation's financial condition. Werther wished to hire her long-time friend and pay him a great deal for an analysis of C-S Aviation's finances, even though Bienenstock was not an accountant, and even though C-S Aviation's lack of assets was already an established fact.

Further, Werther demanded that Grayson, as counsel for Airlines, foot half of Bienenstock's bill.

**F. Werther and Ressler Turn on Grayson, and Act to Oust Her at A Critical Stage of Proceedings**

35. On July 10, 2013, the partial stay of discovery in the two consolidated Southern District veil piercing cases was lifted, after the North Carolina Supreme Court denied review. Grayson immediately suggested that Werther subpoena from Grayson all deposition transcripts from the prior *Jet Star* veil piercing case, so that Werther could come up to speed with the other attorneys. Werther served the subpoenas, and Grayson ably assisted Werther through the hearing at which counsel for Defendant Soros sought, unsuccessfully, to quash the subpoenas. Grayson delivered the original transcripts to Werther with the express understanding that they would be copied and returned. Werther instead stole the transcripts, returning neither copies nor originals.

36. Werther was determined to have as her co-counsel, an attorney who would provide a deep pocket to fund her lavish and unnecessary expert witness hiring plan. At one point, Werther succeeded in persuading a reluctant Grayson to ask the Trustee to fund the litigation expenses Werther desired. The Trustee, however, declined the request. He then became needlessly anxious about litigation costs, even though Grayson assured him that she could fund normal and necessary litigation expenses.

37. When Grayson did not obtain additional funding from the Trustee, Werther resolved to dispose of and replace Grayson. Werther was indifferent to the fact that an attorney brought into the case only a few months before the close of discovery could

not come up to speed on the facts of the case (long known to defendants' counsel), and could not effectively represent Airlines in the veil piercing case.

38. In order to replace Grayson with a malleable, deep pocket law firm of her own choosing, Werther first needed to persuade the Chapter 7 Trustee to fire Grayson. To this end, Werther deliberately fomented discord with Grayson, and sent e-mails to document this discord. Upon information and belief, Werther, directly or indirectly, contacted counsel for the bankruptcy estate's primary creditor, and disparaged Grayson to this attorney. As a consequence of Werther's machinations, the attorney for the bankruptcy estate's primary creditor questioned the Trustee's employment of Grayson, and made telephone calls to the Trustee and/or his counsel threatening to sue the Trustee.

39. On or about August 10, 2013, Ressler and Werther stopped answering Grayson's e-mails and telephone calls. This was very strange and very unprofessional as Grayson and the Ressler Firm were effectively co-counsel in the twin veil piercing actions which had reached a critical stage - to wit a short discovery period on Magistrate Judge Peck's renowned "rocket docket." The one reasonable inference to be drawn from Ressler and Werther's silence was that they had decided to dispose of Grayson as their co-counsel.

40. At approximately the same time that Ressler and Werther ceased communicating with Grayson, the Trustee's counsel, Robert Mayer, informed Grayson that he intended to fly to New York from Miami to meet with Grayson, Werther, and Ressler. Grayson told Mayer that she would contact Werther and Ressler to set up the meeting. Grayson attempted to do so, but Ressler and Werther

did not respond. Subsequently, Mayer informed Grayson that he had heard from Ressler and Werther, and they would meet with him only if Grayson was excluded from the meeting. This, in and of itself, constituted the Ressler Firm's rejection of Grayson as co-counsel and counsel of record. It also demonstrates that Werther and Ressler: (a) intended to say things at the meeting that they did not want Grayson to hear, (b) wished to prevent Grayson from refuting their statements, and (c) wished to impede Grayson's ability to subsequently repeat their false statements in a court of law.

41. Because Ressler and Werther refused to meet with Mayer in Grayson's presence, Mayer arranged two separate meetings for August 15, 2013. He would meet with Grayson in the morning, and Werther and Ressler in the afternoon.

42. Grayson's meeting with Robert Mayer took place at the New York office of Mayer's law firm, Gordon & Rees, in downtown Manhattan. For most of the meeting, Grayson and Mayer discussed substantive issues in the case. Grayson explained at some length, research she had just completed on the issue of collateral estoppel. At one point, Meyer stated that Grayson might be shocked to learn this, but he had pulled her credit or financial information. Overall, however, the tone of the meeting was highly cordial. Meyer told Grayson that she wrote beautifully. At the end of the meeting, Grayson walked Mayer to the offices of the Ressler Firm located at 48 Wall Street, New York, N.Y. On the sidewalk, Mayer kissed Grayson on the cheek, and promised to telephone her that evening to report on the meeting.

43. At the meeting held on the afternoon of August 15, 2013, at the offices of the Ressler Firm, Werther and Ressler defamed Grayson. They falsely stated that

Grayson had, unprofessionally, failed and neglected to shoulder her responsibilities by doing her fair share of work in the coordinated veil piercing cases, and instead left the Ressler Firm to do the lion's share of the work. As a factual matter, precisely the opposite was true. Grayson did the vast majority of the work. The only area where the Ressler Firm took a leading role was electronic discovery, with particular attention to metadata.

44. Werther and Ressler also falsely claimed that Grayson could not take a leading roll in depositions, or handle documents at depositions, because of a conflict of interest. They stated that Grayson was representing TradeWinds Airlines subject to a conflict of interest, and so was violating her ethical obligations as an attorney.

45. Werther and Bruce Ressler further asserted that it was necessary to hire a very expensive expert witness to analyze C-S Aviation's financial status. Upon information and belief, they did not disclose to Mayer, the fact that the witness they wished to hire was a long-time friend of Werther's. Ressler and Werther presented to Mayer, credit and/or financial information that they had gathered on Grayson, as proof that Grayson could not pay such an expert witness. They told Mayer that Grayson had not reimbursed them for half of certain modest expenses, and, upon information and belief, did not explain that they had only very recently requested such payment from Grayson.

46. Werther and Ressler further complained that they found Grayson unresponsive. They portrayed Grayson as ethically and professionally unfit to represent Airlines, and left Mayer in no doubt whatever that they wanted her fired.

47. Late in the evening of August 15, 2013, Mayer telephoned Grayson. His voice was cold as ice. He informed Grayson: "Ellen wants you gone." He went on to provide an account of his meeting with Werther and Ressler as set forth above.

48.  The statements made by Ressler and Werther at their August 15, 2013 meeting with Mayer were, in fact, untrue. Grayson was not ethically or professionally unfit to represent TradeWinds Airlines in the veil piercing case. She was not conflicted. She had very ably and successfully performed the vast majority of the work in the veil-piercing cases to date, including, but not limited to, multiple oppositions to Rule 12(b)(6) motions, obtaining leave for necessary interim discovery while the North Carolina appeals were pending, proposing that Werther subpoena the *Jet Star* transcripts, and ensuring that these subpoenas were not quashed.

49. As regards the Bhise Deposition, Grayson conceived of  it, scheduled it, prepared the documents to be used, and took the lead role in incisively and productively examining the witness, Mr. Bhise.

50. Even before the partnership on the coordinated piercing cases began in the autumn of 2010, Grayson's legal skills and efforts contributed much value to the Ressler Firm's clients. Grayson was the person who first successfully traced ownership and control of shell-corporation C-S Aviation to Soros and Chatterjee, uncovered the unsavory way in which the affairs of that corporation were wound up, and brought the earlier *Jet Star* case to settlement after surviving summary judgment. This laid the groundwork for the subsequent Airlines and Coreolis piercing actions.

51. Grayson also made possible the North Carolina default judgments, of both TradeWinds Airlines and the Ressler clients, by providing legal authority and briefing for

the proposition that affirmative defenses could not be considered at the North Carolina prove-up damages trial. As previously noted, Grayson wrote the veil piercing complaint that the Ressler Firm adopted.

52. When Werther and Ressler made the foregoing false and defamatory statements to the Trustee's counsel, Robert Mayer, on August 15, 2013, they knew the statements to be false. The statements were made with malice, and with intent to injure Grayson in her profession. The false statements were also made with the intention of financially benefitting potential expert witness Bienenstock, and the Ressler clients, who would bear the full cost of Werther's lavish spending plan alone if Werther was not able to bring in deep-pocketed co-counsel.

### G. Grayson's Dismissal and Replacement

53. Trustee's counsel Mayer took the defamatory statements presented to him by Werther and Ressler at the August 15, 2013 meeting, and conveyed them to his client, Chapter 7 Trustee Mukamal. Four days after the Manhattan meeting, on August 19, 2013, the Trustee sent an e-mail to Grayson dismissing her as Airlines' counsel in the veil piercing case. The e-mail was consistent with Mayer's account of the August 15, 2013 meeting, and mentioned Ellen Werther as a reason for Grayson's dismissal. Grayson's dismissal was the consequence of Defendants' machinations and defamatory statements as set forth above.

54. Upon receiving the Trustee's e-mail dismissing her as counsel for TradeWinds Airlines in the veil piercing case, Grayson applied to Florida Bankruptcy Judge A. Jay Cristol, urging him to overrule the Trustee's decision. She contended that the Trustee's decision to dismiss her very late in the case, after she had served as counsel of record for

nearly five years, was likely to produce adverse results for the bankruptcy estate in the veil piercing case. Grayson requested that her application be filed under seal. Judge Cristol declined to file the application under seal, noting that he conducted all proceedings in the "Florida sunshine." Judge Cristol also indicated that he deferred to a bankruptcy trustee's choice of counsel. For this reason, Grayson did not renew her application to Judge Cristol, and instead moved the Federal District Court in Manhattan for leave to withdraw in accordance with Local Civil Rule 1.4.

55. Grayson's application for leave to withdraw was heard by Magistrate Judge Andrew Peck on the morning of September 4, 2013. Robert Mayer appeared as counsel for the bankruptcy Trustee. Judge Peck demanded a reason for the proposed substitution of counsel, to which Mr. Mayer responded that "there was concern about capacity to handle the burdens of this case and the responses and the documents on a timely fashion and to meet her obligations under the retainer agreement." Judge Peck then asked: "When did that come to the trustee's attention?" Mr. Mayer responded: "About a week before we gave notice to everyone else. Perhaps ten days." Judge Peck retorted: "With all due respect, Ms. Grayson is a solo practitioner as I understand it. Presumably you understood that when you hired her -- and by "you" I mean the trustee who you are counsel to. I am not thrilled to put it mildly. . ."

56. When Judge Peck announced, "I'm certainly not inclined to give you an extension of the discovery period," Mr. Mayer requested an *in camera* session to explain a "secondary reason" for Grayson's dismissal. Counsel for Defendant Soros objected, stating:

> The reason you've been given so far is -- keep in mind that the trustee retained
> Ms. Grayson at the end of '08, beginning of '09. Ms. Grayson has been known to

be a single practitioner. But the reason he retained her was because she had been counsel in the previous identical case. So now after five years of her having done a spectacularly good job for them, got them a $56 million judgment in North Carolina, they then awake and say, ah she's not capable? You know, I'm sorry, that doesn't hold water in my case.

57. Mr. Mayer continued to protest about Grayson's "disinterestedness" and "efforts on our behalf" to which Judge Peck responded by telling Mr. Mayer: "[u]nless, you know, something happened in the last week or two that suddenly made Ms. Grayson *per sona non grata,"* the court was not disposed to extend any deadlines. Toward the end of the hearing, Judge Peck stated: "I am not relieving Ms. Grayson at this point until there is substitute counsel." Mr. Mayer responded: "I believe the correct course of action is exactly what your Honor said, that she is to remain in place until -- and we will provide all the parties and to the court as soon as we receive [the order of the Bankruptcy Court appointing new counsel] but she's to take no action during that time." Judge Peck ultimately granted the motion to relieve Grayson, when Grayson protested that she would be committing malpractice by remaining in the case and taking no action.

58. A few hours later, the Bankruptcy Court heard the Trustee's motion to enforce Grayson's termination and impose sanctions. Both Grayson and Mayer appeared telephonically. After being informed that Ms. Grayson had in fact withdrawn from the veil piercing case, Judge Cristol observed: "Ms. Grayson was in this case for quite a period of time, was she not? [] And she has done a lot of work. What provisions have you made for her compensation?" Later, Judge Cristol, addressing Grayson, further stated: "Now, if you wish to pursue  compensation, that remains to be handled down the line. The Court seems to recall that you had successfully pierced the corporate veil against this same debtor at one point, if that information is correct, which raises a question in my

mind of why you're being replaced, but, again, the Court did not appoint you, the Court authorized the trustee to engage you, and the Court does not interfere with the trustee's business judgment and so, therefore, if the trustee made a mistake or it becomes otherwise liable, we'll deal with that in the future." Judge Cristol denied the Trustee's motion for sanctions, and denied a gag order that the Trustee sought to have imposed against Grayson.

59. After Grayson was relieved in the veil piercing case, TradeWinds Airlines went without counsel for two weeks, with approximately four months in the discovery period remaining. Werther took the initiative in locating counsel to represent Airlines. She located and championed the Susman, Godfrey firm, which she favored for their deep pockets. Werther knew, or should have known, that Bill Carmody, the Susman partner whom she had selected to replace Grayson, would not devote the time necessary to rapidly master the facts of the case. Nonetheless, Werther successfully urged the Trustee to retain Susman, Godfrey because the Susman Firm was prepared to pay approximately $200,000 in expert witness fees. The Susman Firm's retention was approved by the Bankruptcy Court on September 18, 2013. At the September 18, 2013 hearing, Judge Cristol once again expressed concern about Grayson's compensation, observing: "if the case is a loser, she still may be entitled to some compensation because if she kept it, she might have won it."

### H. Replacement Counsel and the Ressler Firm Lose the Piercing Cases

60. As was foreseeable, neither Bill Carmody nor any other lawyer at Susman Godfrey mastered the facts of the veil piercing case. Indeed, a revolving cast of lawyers appeared for Airlines. Werther never mastered the pertinent facts either. The Ressler Firm

clients and the Susman Firm *did* spend lavishly on expert witnesses, notably Bienenstock, whose report was entirely unnecessary.

61. When Soros and Chatterjee filed a motion for summary judgment in the veil piercing cases, Werther and Susman Godfrey responded with a combination of: (a) quotations from Judge Baer's opinion in Grayson's *Jet Star* case denying summary judgment on that veil piercing claim; and (b) expert opinion, primarily that of Bienenstock. It does not appear from the papers submitted in opposition to summary judgment that plaintiffs' counsel either gathered substantial new evidence, or fully familiarized themselves with the evidence gathered prior to Grayson's dismissal. Highly probative evidence was missing from plaintiffs' submission in opposition to summary judgment. For example, Bharat Bhise's testimony about Soros taking an axe or hatchet to C-S Aviation was missing. Critical correspondence between Soros' counsel and C-S Aviation personnel, which played a pivotal roll when plaintiff Jet Star survived summary judgment in *its* veil piercing case, was missing from the new opposition to summary judgment.

62. The Ressler Firm and Susman Godfrey were also grossly ineffective in failing to include in their opposition to summary judgment any argument that Defendant Purnendu Chatterjee was responsible for C-S Aviation's abuse of the corporate form, and that the corporate veil of C-S Aviation should be pierced to reach him. The evidence against Chatterjee was very strong, because he was always the sole shareholder of C-S Aviation, and, at pertinent times, C-S Aviation's sole director. Chatterjee's abuse of the corporate form was sufficient to overcome a summary judgment motion in 2006 in the *Jet Star* case, and, in the period intervening between 2006 and the summary judgment

motion in the subsequent piercing cases, Chatterjee engaged in further abuse of the corporate form. He allowed C-S Aviation's corporate status to lapse, then revived C-S Aviation solely for the purpose of defending the North Carolina action, filed false addresses for C-S Aviation with the state of Delaware, and sent a *faux* corporate officer to appear as a warm body at the North Carolina damages trial.

63. Defendants objected to the purported expert opinion of Bienenstock on the ground that he was an attorney rather than an accountant, and was not qualified to render an opinion regarding the finances of C-S Aviation. Judge Keenan never reached the issue of Bienenstock's qualifications, because he granted summary judgment for Soros and Chatterjee on an issue the Ressler Firm and Susman Godfrey neglected to brief.

64. Soros and Chatterjee had urged that the case required "double piercing" insofar as George Soros had controlled C-S Aviation not directly, but rather through his corporation Soros Fund Management. Plaintiffs should have responded to this assertion by arguing, in the alternative, that: (a) George Soros controlled C-S Aviation directly, and (b) double piercing was warranted because Soros Fund Management, like C-S Aviation, was organized as a shell management corporation without assets, and Soros had ignored and abused the corporate form in conducting the affairs of Soros Fund Management. Instead, the Ressler Firm and Susman Godfrey cavalierly asserted that this was "not a double piercing case." They failed to muster the best evidence for the proposition that George Soros controlled C-S Aviation directly. They failed to present evidence that Soros had ignored and abused the corporate form in conducting the affairs of Soros Fund Management, although strong evidence was already available at the time of Grayson's dismissal, and was a matter of public record. What is more, the Ressler Firm and Susman,

Godfrey evidently failed to use discovery to gather additional evidence that Soros had ignored and abused the corporate form in conducting the affairs of Soros Fund Management.

65. The Ressler Firm and Susman Godfrey were ineffective, not only in failing to present evidence in opposition to summary judgment, but also in failing to cite pertinent legal authority, including Second Circuit authority for the proposition that funding and facilitating litigation on behalf of a shell corporation warrants piercing of the corporate veil. As a consequence of the sub-par legal services rendered by the Ressler Firm and Susman Godfrey, summary judgment was granted to Defendants Soros and Chatterjee in the piercing cases on March 31, 2015. The Second Circuit affirmed via summary order on March 11, 2016. If Grayson had not been dismissed, she would have rendered excellent legal services, and the motion for summary judgment would have been denied.

### I. Grayson's Fee Application for Hourly Compensation, Settlement Conference, and Follow-on Lawsuit

66. Neither the Trustee's counsel, nor Susman Godfrey, nor the Ressler Firm, saw fit to make any filing in the Bankruptcy Court, informing the Court and creditors of either the entry of summary judgment against plaintiffs in the veil piercing case or the Second's Circuit's affirmance of said judgment. They also did not see fit to inform Grayson. Nonetheless, Grayson found the information on PACER. She forwarded it to the Bankruptcy Court.

67. After Grayson informed the Bankruptcy Court of the loss of the piercing case, Grayson applied to the Bankruptcy Court for hourly compensation out of the funds on hand in the bankruptcy estate. A hearing was held on March 16, 2016. The Trustee's

counsel, Lynn Gollin, insisted that Grayson was entitled to nothing because the piercing

case had been lost. Judge Cristol rejected this contention:

> THE COURT: -- and then you could terminate her without cause and not give her
> any money?
>
> MS. GOLLIN: No. If she was ---
>
> THE COURT: I reject your -- I'm not persuaded by your arguments. Now, the
> way I see it, as I said, we're not going to retry the case. I don't know whether there
> was malpractice in that case or not, but that's not my concern here. Your
> statement that the estate is insolvent, that may be, but if the estate is insolvent and
> Ms. Grayson was entitled to some compensation, that would all go in the pot and
> it would be prorated, and if the people got 80 percent, or 60 percent, or whatever
> they got of what they were entitled to, that would be the way the cookie would
> crumble, but my feeling here is that there are arguments on both sides, but your
> argument at this point, Ms. Gollin, is not persuasive to me, and I think that the
> best thing that the parties can do is to go ahead with this settlement conference
> and see if you can resolve the matter, and if you're able to do so, then we can put
> it to bed.

68. After the foregoing hearing before Judge Cristol, Grayson sat down on a

bench outside of Judge Cristol's courtroom with Trustee's counsel Lynn Gollin. Grayson

offered Ms. Gollin her opinion that the Trustee should: (a) proceed with a veil-piercing

suit against Soros Fund Management, and (b) proceed with a malpractice suit against

Susman Godfrey or else obtain a tolling agreement re same. When Grayson subsequently

followed up with Ms. Gollin, and asked what action the Trustee planned to take with

respect to her two above suggestions, Ms. Gollin would say nothing except that

Grayson's ideas had been conveyed to the Trustee.

69. On May 10, 2016, a settlement conference regarding Grayson's fee

application was held with Florida Bankruptcy Judge Laurel M. Isicoff presiding as

settlement judge. Ms. Gollin, Mr. Mayer, Trustee Mukamal, and Ms. Grayson, all

attended. Werther and Ressler had declined the opportunity to participate as parties.

Nonetheless, Werther and Ressler spoke by telephone with Mr. Mayer, and possibly some of his colleagues, during the conference.

70. The conference resulted in a somewhat complex partial settlement, subject to Bankruptcy Court approval. Grayson agreed to delete from her application for hourly compensation, travel time, time spent opposing the disqualification motion, and time spent on the North Carolina case that was not requested by North Carolina counsel. The Trustee agreed to compensate the remaining time at the rate of $500 per hour, regardless of whether Grayson was fired for cause or not for cause. Since the "cause" issue would now not be litigated, the Trustee was relieved from Judge Cristol's prior order requiring him to provide Ms. Grayson with all documents pertaining to her dismissal. The Trustee waived all claims for costs the bankruptcy estate had incurred in litigating with Grayson. A short fuse was set for Grayson filing her revised fee application. Grayson was to receive a down payment of $90,000. The entire agreement was subject to the proviso that payment could be adjusted at the end of the bankruptcy case, in the event of administrative insolvency. The subjects of a follow-on veil piercing lawsuit against Soros Fund Management, or a follow-on malpractice suit against Susman Godfrey, were not covered by the settlement agreement.

71. The Trustee's application for approval of the settlement agreement came on, by noticed motion, on May 23, 2016. No objection was filed by the Ressler Firm or by anyone else. Judge Cristol approved the settlement. Grayson received her interim payment of $90,000, and began work on her revised fee application. The revised fee application was completed on or about June 20, 2016, and on June 22, 2016, the Florida Bankruptcy Court dispatched an ECF order setting hearing on the revised application for

July 27, 2016.

72. Meanwhile, the Trustee and the Ressler Firm were moving forward clandestinely with a follow-on veil piercing suit against Soros Fund Management, arising out of the same nexus of fact as the original veil piercing suits. At the time of the settlement conference, the Trustee and the Ressler Firm were evidently already in negotiation with potential counsel to commence such an action, but did not disclose this information to Grayson. They filed the case (in which Coreolis and TradeWinds Airlines were both plaintiffs), in North Carolina State Court on May 26, 2016, three days after the Florida Bankruptcy Court approved the partial settlement between Grayson and the Trustee. It seems likely that the Trustee and the Ressler Firm deferred filing of the new lawsuit until just after Judge Cristol approved the partial settlement, lest knowledge of the new suit motivate Grayson to back out of the settlement.

73. The new suit (hereafter the "Follow-on Case"), on behalf of TradeWinds Airlines, was filed without the approval of the Florida Bankruptcy Court, although advance approval of counsel to file such an action was legally required. Moreover, the Trustee and the Ressler Firm delayed notifying the Bankruptcy Court of the filing for more than a month, until a few days after Grayson filed her revised fee application. Grayson suspects that the Trustee and the Ressler Firm delayed informing the Bankruptcy Court of the Follow-on Case, in the hope that Grayson, unaware of the new suit, would file a final fee application for a set hourly sum, and request no share of the lawsuit she did not know about. Grayson, however, in an abundance of caution, filed an interim fee application seeking not only hourly compensation, but also a share of any recovery against Soros Fund Management, if such a suit was filed and succeeded.

74.  The Trustee's application to retain counsel for the Follow-on Case explained that the Follow-on Case would proceed in North Carolina State Court, to pierce the corporate veil of shell corporation C-S Aviation, in order to recover the default judgments from Soros Fund Management. It further explained that the Follow-on Case would utilize the discovery from the prior Manhattan federal district court veil piercing case:

> Counsel for Coreolis [i.e. the Ressler Firm] has agreed to continue with respect to jointly prosecuting the NC Veil Piercing Action [the Follow-on Case]. The Court files from the New York Action are in Coreolis's counsel's possession and access to those files will be given Special Counsel. As such, litigation of the NC Veil Piercing Action should be streamlined and minimal discovery should be necessary.

75. Consistent with the above, Werther approached Judge Keenan and requested modification of the protective order governing documents produced in the New York veil-piercing case, to allow them to be used in the Follow-on Case. On May 26, 2016, Werther wrote to Judge Keenan: "The North Carolina Enforcement Action is based, in large part, on the record of the NY Action and the discovery taken in the NY Action . . . unless relief is granted, the same discovery will be sought from the same custodians, the materials will have be reproduced, and reviewed yet again - causing needless duplication of effort and unnecessary expense." Judge Keenan agreed with Ms. Werther. On July 20, 2016, he granted her request. Judge Keenan stated: "Plaintiffs' claims in the North Carolina action are closely related to the claims before this Court. Without modification of the Protective Order, the same discovery materials will likely have to be reviewed and reproduced, needlessly causing duplication of effort and extra expense."

76. Seven days after Judge Keenan made the foregoing order, Grayson's revised fee application came on for hearing in the Florida Bankruptcy Court. The Ressler Firm and its clients had filed no objection to Grayson's settlement with the Trustee,

presumably because they wished to benefit from the element of the settlement that relieved the Trustee of his duty to provide Grayson will all documents pertinent to her termination. When, however, Grayson filed her revised fee application, Ressler client, Coreolis, filed opposition, urging that Grayson should receive nothing, and should even be required to disgorge the $90,000 that she had already received. The essence of Coreolis's opposition to Grayson's revised fee application was that the settlement agreement approved by the Bankruptcy Court should be completely unwound.

77. Specifically, Coreolis claimed that:

(a) Grayson should receive no hourly fees because she was originally retained on a contingency basis (even though the settlement agreement specified the hourly rate and category of hours to be billed);

(b) Grayson could not receive *quantum meruit* compensation because "the case was lost." (Coreolis conveniently failed to mention the already-filed Follow-on Case in this connection.);

(c) Grayson was terminated for cause. (Coreolis conveniently failed to mention that, per the settlement agreement, Grayson was entitled to compensation regardless of whether she was terminated for cause, and that, in exchange for this concession, the Trustee was relieved of his duty to provide Grayson with a copy of every document pertinent to her termination.);

(d) Grayson's fee should be subject to an offset for the bankruptcy estate's expenses incurred in litigating with Grayson. (Coreolis conveniently failed to mention that the settlement agreement expressly waived any claim for such expenses);

(f) Grayson's undisclosed settlement agreement with Soros settling the *Jet Star*

case disqualified her from receiving compensation. (Coreolis conveniently failed to mention: (i) that the existence of this settlement was disclosed when Grayson's retention was approved by the Bankruptcy Court, (ii) that any claim for disgorgement of the *Jet Star* settlement that Soros might assert against Grayson did not create a conflict of interest between Grayson and TradeWinds Airlines, (iii) that Soros asserted no such claim, and (iv) that both the Trustee and Coreolis continued to make use of Grayson's services for many years after they received Judge Keenan's opinion denying Soros's disqualification motion).

78. Coreolis's standing to file the foregoing Opposition to fee application was itself suspect. During the period while Werther was on friendly and confidential terms with Grayson, Werther informed Grayson that Coreolis had filed a creditor's claim in the bankruptcy case, not because the estate owed Coreolis money, but simply to create standing for Coreolis to influence the proceedings.

79. At the July 27, 2016 hearing on Grayson's revised fee application, Judge Cristol questioned Ms. Werther concerning Coreolis's Opposition to Grayson's application. The colloquy was as follows:

> Ms. Werther: Good morning, Your Honor. Thank you for accommodating me. First of all, I'd like to make clear that Coreolis and TradeWinds Holdings support the position of the Trustee. We have filed a separate objection, and whenever the Court believes it is appropriate to address objections to Ms. Grayson's claim, we would like our objections to Ms. Grayson's claim, we would like our objection to be then considered on the merits.

> The Court: Well, your objection, I believe, is that she's not entitled to anything; is that correct?

> Ms. Werther: Well because of her on-going failure to disclose, her affirmative --

> The Court: I'm not arguing here. My question is, is that your position, she shouldn't get anything?

Ms. Werther: Yes, Your Honor.

The Court: Well, I think that's an interesting position. Whether or not it has any chance of succeeding is an entirely different matter, but your certainly willing, if you wish, to file a memorandum of law or proposed order . . .

80. At the present time, Grayson's revised fee application remains under submission.

81. As for the Follow-on Case, Soros removed it from North Carolina State Court to the Federal District Court for the Middle District on North Carolina. On March 31, 2017, the North Carolina federal court remanded the case to North Carolina State Court.

### FIRST CAUSE OF ACTION FOR DEFAMATION

82. Plaintiff repeats and incorporates by reference the prior allegations of this Complaint.

83. On August 15, 2013, in the afternoon, at the offices of the Ressler Firm, located at 48 Wall Street, New York, N.Y., Ressler and Werther defamed Plaintiff Grayson to Robert Mayer, by disparaging her legal ethics, professional diligence, and fitness as an attorney. As set forth in greater detail in paragraphs 43-53, *supra,* Ressler and Werther claimed that Grayson was violating rules of professional ethics and conduct by representing a client, TradeWinds Airlines, with whom she had a conflict of interest. They further claimed that because of this conflict of interest, Grayson could not handle documents or taking a leading role at depositions, and therefore could not effectively serve her client. They claimed that Grayson did not do her fair share of work on the veil piercing cases, and in this way neglected her client. They claimed that Grayson was unresponsive to them to the detriment of the veil piercing cases. All of these statements were objectively and factually false. Grayson did not have a conflict of interest with her

client. Grayson handled documents and took the leading role at the Bhise deposition, and was prepared to do so at all depositions going forward. Grayson did far more work than the Resslers did on the twin piercing cases, and did that work very well indeed. Grayson was not unresponsive to Ressler and Werther. On the contrary, she promptly responded to all of their communications, questions, and issues. It was Ressler and Werther who became unresponsive to Grayson, by refusing to answer her e-mails and telephone calls beginning on or about August 10, 2013.

84. Defendants Werther and Ressler made the false statements set forth above with knowledge that they were false, with malice, and with intent to harm Grayson in her profession. Werther and Ressler expected and intended that their defamatory and false statements would be repeated by Mayer to Trustee Mukamal, with the consequence that Grayson would be dismissed as counsel for TradeWinds Airlines in the veil piercing case. Werther and Ressler further intended and expected that their false and defamatory statements would more generally injure Grayson's professional reputation. All of this in fact transpired.

85. The defamatory and false statements of Werther and Ressler harmed Grayson by: (a) depriving Grayson of the opportunity for professional advancement and positive publicity which would have come from successfully prosecuting the veil piercing case, (b) depriving Grayson of her full contingency fee for successful prosecution of the veil piercing case, (c) injuring Grayson' professional reputation, and (d) causing Grayson severe emotional distress.

86. The defamatory statements set forth above constitute defamation *per se* because they disparaged Grayson in her profession. The defamatory statements

constituted morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society. For this reason, Grayson would be entitled to punitive damages from Werther and Ressler, even if she suffered no specific economic injury as a consequence of such defamation.

## SECOND CAUSE OF ACTION FOR INJURIOUS FALSEHOOD

87. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

88. Defendants circulated injurious falsehoods concerning Grayson to Trustee Mukamal, to the Trustee's counsel, and to counsel for the primary creditor of the Chapter 7 estate, as previously set forth herein. These injurious falsehoods included the defamatory statements set forth in the previous cause of action. Upon information and belief, Defendants also circulated injurious falsehoods concerning Grayson to other persons involved with the affairs of TradeWinds Airlines and the veil piercing litigation, including attorneys at Tuggle, Duggins. Upon information and belief, Defendants continue to circulate injurious falsehoods concerning Grayson. Grayson anticipates that the details of these further injurious falsehoods will be unearthed through the discovery process.

89. The injurious falsehoods circulated by Defendants caused Grayson to suffer special economic damages in the sum of $9,730,000 plus statutory interest accruing from July of 2010 forward. This sum is calculated by applying percentages contained in Grayson's contingent fee agreement to the default judgment entered against shell corporation C-S Aviation in July of 2010. Grayson also suffered further general

economic damages because the injurious falsehood circulated by Defendants damages her professional reputation and prospects.

90. The injurious falsehoods circulated by Defendants herein constituted morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society. Grayson is therefore entitled to punitive damages.

### THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT

91. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

92. From the winter of 2009 forward, Ressler and Werther were aware that Grayson had entered into a valid contract with Trustee Mukamal, under which Grayson was to prosecute a veil piercing case on a contingent fee basis. The precise terms of the contract became a matter of public record when it was filed with the Florida Bankruptcy Court on February 24, 2009.

93. Defendants intentionally and improperly procured the breach of Grayson's contract with the Trustee as follows. As previously set forth, Defendants defamed Grayson's professional probity, professional work ethic, and effectiveness as an attorney in the veil piercing case, and circulated injurious falsehoods concerning Grayson. Werther and Ressler also deliberately fomented discord for the purpose of then telling Trustee Mukamal, and his agent Robert Mayer, that they could not get along with Grayson and could not work with Grayson. Defendants told the Trustee's agent, Mayer, that Grayson was unresponsive. Defendant Werther informed Mayer that she wanted Grayson gone. Defendants arranged a meeting with Mayer, from which Grayson was

excluded, so that they could privately induce the Trustee to terminate and breach his contract with Grayson. They succeeded in inducing such breach.

94. The Trustee in fact breached his contingency fee contract with Grayson, and the covenant of good faith and fair dealing contained therein, by: (a) using Grayson's services for nearly five years, (b) then firing her and (c) resisting making any payment for Grayson's services. This breach of contract resulted from Defendants' tortious conduct as set forth above. Plaintiff further notes that Defendants' tortious interference with Grayson's contract with the Trustee is on-going, insofar as, upon information and belief, Defendants continue to urge the Trustee to resist paying Grayson for her work.

95. The Trustee's breach of contract has injured Grayson economically by depriving her of her contingent fee in the veil piercing case, and by causing her to expend many hours of valuable legal work time attempting to obtain payment for her efforts on behalf of TradeWinds Airlines. Grayson is entitled to compensation for these economic injuries.

96. Defendants' actions designed to induce the Trustee to terminate his contract with Grayson were unprivileged and malicious. These actions constituted morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society. Grayson is therefore also entitled to punitive damages.

### FOURTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

97. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

98. By defaming Grayson, circulating injurious falsehoods concerning Grayson, and fomenting discord, as previously set forth herein, Defendants interfered with the prospective business advantage that Grayson would have enjoyed had she been allowed to successfully complete her representation of Airlines in the veil piercing case. Grayson was deprived of the opportunity for professional development and positive publicity associated with the veil piercing case, and her professional reputation was injured by negative publicity. This will impair Grayson's ability to attract new clients for the rest of her professional career. Unfortunately, Defendants' tortious interference with Plaintiff's prospective business advantage remains on-going as this First Amended Complaint is filed.

99. Defendants' actions interfering with Grayson's prospective business advantage were and are malicious and unprivileged. Their actions constitute morally culpable, wanton, and outrageous conduct such as should not be tolerated in a civilized society. Grayson should therefore be awarded punitive damages as well as compensatory damages.

### FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT

100. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

101. In or about October of 2010, Grayson and Defendants entered into an oral contract to work together cooperatively to successfully prosecute their parallel veil

piercing cases, and each benefit from their respective contingency fee. The oral

contract was augmented by the parties' subsequent conduct and course of dealing.

The resulting contract was simultaneously an oral contract, an implied-in-fact

contract, and a contract implied by law. Like every New York contract, it contained

an implied covenant of good faith and fair dealing, which embraced a pledge that

neither party shall do anything which will have the effect of destroying or injuring the

right of the other party to receive the fruits of the contract.

102. Defendants breached their contract with Grayson, and the covenant of good

faith and fair dealing contained therein. They received full benefits under the contract,

relying heavily upon Grayson's knowledge of veil piercing law, and knowledge of

facts, lawyer personalities, and witness personalities, derived from the *Jet Star* case.

Without Grayson's assistance, Werther and Ressler would have found themselves at a

disadvantage relative to the lawyers on the defense side of the case, who had served

in the prior *Jet Star* suit. The Ressler Firm relied upon Grayson to carry the ball at the

critical Bhise deposition, where they were at sea, due to their lack of knowledge of

both facts and personalities. Subsequently, Defendants relied upon Grayson to

prepare a list of witnesses to be deposed, based upon her superior knowledge. What is

more, Defendants relied upon Grayson to perform virtually all of the legal research

and writing in the coordinated cases. The foregoing list of services is illustrative,

rather than exhaustive. Grayson performed all of the foregoing work to a high

standard.

103. Notwithstanding Grayson's dedicated and complete performance under the

contract, Defendants deliberately deprived her of its fruits by: (a) wrongfully

procuring Grayson's ouster as counsel of record, after she had been performing under the contract with Defendants for approximately three years and serving as TradeWinds Airlines' counsel of record for nearly five years; (b) causing Grayson to be replaced by attorneys who could not and did not come up to speed in the case; (c) filing substandard papers in opposition to summary judgment with the consequence that both veil piercing cases were dismissed; (d) interfering with and opposing Grayson's efforts to obtain compensation for her work out of the TradeWinds Airlines bankruptcy estate; (e) attempting to unwind Grayson's partial settlement with the Trustee; (f) filing a Follow-on Case that relies heavily on Grayson's work and yet maintaining that Grayson is entitled to no compensation from proceeds of that case.

104. Defendants' breach of their contract with Grayson has caused Grayson severe economic injury, including loss of compensation for her work on the veil piercing case, loss of professional opportunities that would have flowed from her successful prosecution of the veil piercing case, and damage to her professional reputation. Defendants' breach of the covenant of good faith and fair dealing contained in their contract with Grayson is continuing, to the extent that Defendants' efforts to deprive Grayson of the fruits of said contract remain on-going.

## SIXTH CAUSE OF ACTION IN *QUANTUM MERUIT*

105. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

106. Under New York law, a party may recover under a theory of *quantum meruit* where the claimant establishes: (a) the performance of services in good faith, (b) the acceptance of the services by the person to whom they were rendered, (c) expectation

of compensation therefore, and (d) the reasonable value of the services. The right to recover in *quantum meruit* does not require a showing that defendant actually benefitted from the services performed.

107. In this case, Grayson rendered services to Defendants Werther and Ressler by carrying most of their workload in the consolidated veil piercing cases for a period of approximately three years. The Defendants gratefully accepted Grayson's services. They were free to work on their other cases, include the automobile dealership cases, because Grayson was carrying their load in the veil piercing cases. The value of the services rendered by Grayson was, at a minimum, equal to the 798.8 hours that Grayson worked on the consolidated veil piercing cases during her partnership with Defendants, multiplied by her hourly rate of $500 per hour, for a total of $399,400. Obviously, if Defendants succeed in their Follow-on Case, by utilizing Grayson's work, the value of her work to Defendants will be much higher.

108. Grayson *did* expect compensation for her services when she rendered them. At the time that Grayson rendered her services, she expected to be compensated out of TradeWinds Airlines' recovery in the Southern District of New York veil piercing case. Unfortunately, due to Defendants' wrongful machinations, as previously set forth herein, there was no such recovery. The Florida Bankruptcy Court may be disposed to compensate Grayson for her professional services, notwithstanding the loss of the Southern District veil piercing case, but may be able to offer only incomplete pro-rated compensation, should the bankruptcy estate prove administratively insolvent (i.e. should the funds on hand be insufficient to pay all professionals' fees.) Trustee's counsel, Lynn Gollin, has asserted that the bankruptcy

estate is administratively insolvent. The Bankruptcy Court may also be influenced to reduce the compensation of all counsel to afford some recovery to the estate's creditors, which include the Detroit Employees' Pension Fund. Under these circumstances, Defendants in this action should be required to compensate Grayson for her services that they solicited and received.

## SEVENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT

109. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

110. The elements of unjust enrichment under New York law are: (a) defendant was enriched, (b) at plaintiff's expense, (c) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.

111. To the best of Plaintiff's knowledge, Defendants have not yet been enriched by their veil piercing cases, although they may already have been enriched by the automobile dealership cases and other cases that Plaintiff's services left them at liberty to prosecute. If Defendants succeed in their Follow-on Case, they will profit greatly from their contingency fee in that case, which fee Plaintiff believes to be equal to fifty percent of the proceeds.

112. Defendants' Follow-on Case relies heavily on work performed by Grayson. Grayson originally traced the ownership of C-S Aviation to Soros and Chatterjee. She laid the groundwork for the subsequent veil-piercing cases with her *Jet Star* case. She filed the TradeWinds Airlines veil piercing case, which gave Defendants the idea for their claims on behalf of Coreolis and Holdings. She provided Defendants with a template complaint. She ensured that the default judgments in North Carolina were

not overturned by affirmative defenses. She did most of the work -- including

virtually all research and writing -- during the three year period when Grayson and

the Ressler Firm were effectively co-counsel on the twin piercing cases.

113. Under these circumstances, it would be unjust for Defendants to retain their

entire contingency fee from the Follow-on Case, should said case succeed, while

paying Grayson nothing for her services. This would be true particularly if the

Bankruptcy Court denied Grayson a fee from Airlines' Follow-on Case, or reduced

such fee substantially because there were other counsel -- including replacement

special litigation counsel and Trustee's counsel -- to be paid, and a reasonable sum

should be reserved for the bankruptcy estate's creditors. Thus, Grayson would still be

entitled to an unjust enrichment recovery from the Ressler Firm if the Ressler clients

prevailed in the Follow-on Case. Even if the Ressler Clients did not prevail in the

Follow-on Case, Grayson would be entitled to an unjust enrichment recovery because

her services freed up Defendants' time to the extent that this enabled them to recover

in other cases.

**EIGHTH CAUSE OF ACTION FOR CONVERSION**

114. Plaintiff repeats the preceding allegations of this Complaint and incorporates

them herein by reference.

115. As previously set forth, Defendants took delivery of Grayson's deposition

transcripts from the *Jet Star* case, conditional upon a promise to copy the transcripts

and promptly return the originals to Grayson. Defendants breached their promise to

copy and return the transcripts. They returned neither the original transcripts nor

copies. Defendants retained the transcripts, converting the transcripts to their own use, and permanently depriving Grayson of the transcripts.

116. In converting and stealing Grayson's transcripts, Defendants acted with wanton malice and disregard for the property rights of others.

117. The transcripts were Grayson's valuable property. Grayson was damaged by their conversion to Defendants' use, while Defendants benefitted from the conversion. Grayson should therefore be awarded compensatory and punitive damages for conversion of her *Jet Star* deposition transcripts by Defendants.

**NINTH CAUSE OF ACTION FOR TRESSPASS TO CHATTLE**

118. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

119. By depriving Grayson of her *Jet Star* deposition transcripts, Defendants trespassed against Grayson's chattel. This trespass to chattel was damaging to Grayson and beneficial to Defendants.

120. In trespassing against Grayson's chattel, Defendants acted willfully, with malice, and with wanton disregard for Grayson's property rights. Grayson is therefore entitled to compensatory and punitive damages from Defendants for trespass to her chattel.

**TENTH CAUSE OF ACTION FOR PRIMA FACIE TORT**

121. Plaintiff repeats the preceding allegations of this Complaint and incorporates them herein by reference.

122. Plaintiff pleads, in the alternative, a cause of action for *prima facie* tort. To the extent that Defendants acted out of disinterested malevolence, as for example, by

undermining and interfering with the Trustee's partial settlement with Grayson, they are liable to Grayson for actual and punitive damages under a theory of *prima facie* tort.

## PRAYER FOR RELIEF

**WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANTS, AND EACH OF THEM, ON ALL CAUSES OF ACTION, AS FOLLOWS:**

1) Awarding compensatory damages in a sum not less than $20 million;

2) Awarding punitive damages, if and as provided by law, and per proof at trial;

3) Awarding interest as provided by law;

4) Declaring that Grayson is entitled to share in any recovery that the Ressler Firm may enjoy in the Follow-on Case;

5) Awarding such other and further relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

S/s_____

Violet Elizabeth Grayson
Plaintiff *In Propria Person*